**Warren Nathaniel CALDWELL, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Nov. 17, 1972.

Ben B. Wright, Jr., Wright & Wright, Hopkinsville, for appellant.

John B. Breckinridge, Atty. Gen., James H. Barr, and M. Curran Clem, Asst. Attys. Gen., Frankfort, for appellee.

## PER CURIAM.

Warren Nathaniel Caldwell pleaded guilty to an indictment charging him with the willful murder of William Matthew Bell. KRS 435.010. The jury fixed his penalty at death. His appointed counsel have prosecuted this appeal, contending as follows: (1) The court erred in denying a change of venue; (2) the court erred in accepting the guilty plea without first determining that the plea was made voluntarily and understandingly; (3) a confession was improperly admitted into evidence because it was an involuntary confession; and (4) the Commonwealth's attorney improperly commented on the failure of the accused to testify.

On the morning of August 18, 1970, Caldwell and three companions appeared at a country store operated by William Matthew Bell, age 83, and his wife, Ethel Bell, age 82. One of the four remained outside the store in an automobile, which belonged to appellant's mother, while the other three entered. Apparently Caldwell was the only one of the group who was armed. Both Mr. and Mrs. Bell were shot and killed and their store was robbed. The other two men who were in the store with Caldwell testified that he shot and killed both Mr. and Mrs. Bell, and Caldwell confessed it in his written statement, which will be discussed later in the opinion. The four men had worked briefly on

a farm in the neighborhood of the store earlier on the morning of the double slayings. They had returned to Hopkinsville, the county seat, and consumed about five fifths of wine before embarking on their criminal excursion. The farmer for whom they had worked that morning observed that Caldwell had a pistol on his person at that time.

The trial court conducted a hearing on the motion for change of venue and denied the motion. This action is challenged in a three-pronged argument: (a) The affidavits and testimony introduced by the appellant established the need for a change of venue; (b) the evidence presented by the Commonwealth is not entitled to serious consideration as a matter of law; and (c) there is a clear probability that the jury was corrupted by pretrial publicity and community hostility.

First, it is insisted that the affidavits and testimony presented by Caldwell clearly demonstrated his entitlement to a change of venue. The motion was filed October 12, 1970, and the evidentiary hearing was had on October 16, 1970. On October 15, 1970, one day before the hearing, the trial judge entered an order to summon seventy-five additional jurors for the first day of the trial because of the "particular nature of this case, and for other reasons, deemed sufficient by the Court." It is contended that the very entry of such an order demonstrates on its face that the trial judge already knew it would be difficult to obtain a jury in Christian County because of the notoriety of the case. This contention is unsound. In the appropriate exercise of judicial discretion and in full recognition of the well-known facts of life pertaining to the qualification of jurors in any capital case, the trial judge had the right and duty to take preliminary steps conducive to an orderly and prompt dispatch of the proceeding.

The petition for change of venue was supported by the affidavits of three citizens. At the hearing four witnesses

appeared in person and expressed the view that Caldwell could not obtain a fair trial in Christian County. Appellant presented other evidence by affidavit supporting his motion for change of venue. The Commonwealth introduced four witnesses who testified that in their opinion a fair trial for the appellant could be had in Christian County. The first of these witnesses was A. S. Koon, who had formerly been mayor of Hopkinsville and was serving as Alcoholic Beverage Control administrator of that city at the time he testified. The next witness for the Commonwealth was Thomas E. Morris, clerk of the Christian County Court, who was followed by Frank Chilton, a member of the city council of Hopkinsville. The final witness for the Commonwealth was G. H. Norfleet, sheriff of Christian County. In addition, six other affidavits were submitted by the Commonwealth. These six affiants were employed in various branches of public service; they were a postal clerk, a deputy county court clerk, and four magistrates serving on the Christian Fiscal Court. Appellant directs attention to Benge v. Commonwealth, 296 Ky. 82, 176 S.W.2d 131 (1943), in which this court reversed a judgment of conviction because of error in the trial court's refusal to grant a change of venue. Though it was noted in *Benge* that the only evidentiary material in behalf of the Commonwealth was given by officials of the county, that alone was not the basis for the decision. The record clearly showed that for some years a state of lawlessness and feudal violence had persisted in Clay County, in which the county officials were allied with a faction that was bitterly antagonistic to the faction of which Benge was a member.

There was conflict in the evidence concerning whether Caldwell would obtain a fair trial in Christian County. The trial judge was charged with the responsibility of resolving that conflict, and he was not persuaded from the evidence that a situation existed which probably would prevent the accused from obtaining a fair and impartial trial in Christian County.

See Hurley v. Commonwealth, Ky., 451 S.W.2d 838 (1970); Williams v. Commonwealth, 287 Ky. 570, 154 S.W.2d 563, 136 A.L.R. 1398 (1941); and cases therein cited and discussed.

It is our opinion that the evidence was not so strong as to require the trial judge to grant the change of venue and that the evidence to the contrary was neither invalid as a matter of law nor so weak as to lack substantial probative value.

■ The third aspect of the claim that the court erred in denying the change of venue relates to the pretrial publicity and alleged community hostility said to have existed at the time of the trial. Thirteen editions of the Kentucky New Era, the only local paper published in Hopkinsville, were filed as exhibits in behalf of the defense. Eleven of the jurors who were ultimately accepted testified that they had read some or all of the articles in that paper. There was other evidence indicating that similar news of the crimes had been broadcast over the local radio station. It is well to note that the trial proceedings began October 19, 1970, and that the slayings had occurred on August 18, 1970. As noted in the brief for the Commonwealth, the following information was contained in the various editions of the newspaper and in the broadcasts: (a) On August 17, 1970, at 9:55 p. m., Henry Carol Hampton, age 36, was shot three times with a .22-caliber pistol while seated in his truck outside the local hospital waiting for his wife; three Negro men were wanted for the shooting; (b) On August 18, 1970, Mr. Bell, age 83, and Mrs. Bell, age 82, were shot and robbed in their country store while preparing to eat lunch; a picture of the couple was published, and the news articles stated that they had been beaten and shot in the head; both Mr. and Mrs. Bell died as a result of their wounds; (c) A .22-caliber pistol was used in the shooting of Mr. and Mrs. Bell; (d) The newspaper reported that there was considerable public alarm and that people were taking self-defense precautions, including

inquiry of the county judge as to the law respecting carrying firearms; (e) A solicitation was conducted to raise a reward fund for information leading to the arrest and conviction of the culprits in the Bell case; (f) On August 23, 1970, four individuals including Caldwell were arrested and charged with the shooting of Hampton and the Bells; their names, addresses, and ages were listed; it was reported also that Caldwell was charged with breaking into the local social security office; (g) It was reported that Hampton had died from his wounds; (h) It was reported that the pistol used in the crimes had been tossed into the river; an unsuccessful search of the river in the presence of a large number of people was conducted, and accounts of that event were carried in the paper.

The appellant calls attention to the fact that the news coverage repeatedly identified him as being charged with the murder and attempted robbery of Hampton, the murders of Mr. and Mrs. Bell, the robbery committed in the Bells' store, and breaking and entering the social security office. He points out that on nine separate occasions, in front-page articles in the only local newspaper, during the eight weeks preceding the trial, all of the felonies and all of the defendants were linked. He contends it is unreasonable and irrational to assume that the eleven jurors who admitted having read all or some of these articles were unaware of the other charges pending against Caldwell. Counsel for appellant point out that they were forced to trial "in an atmosphere that would almost assure a prejudiced jury and worse yet [were] faced with the trilemma of (1) impugning the honesty of prospective jurors, (2) calling attention to the other felonies by voir-dire questioning, or (3) accepting jurors who by every criterion of common sense must know of the other charges."

■■ All reference to the shooting of Mrs. Bell was deleted from the confession and other evidence offered before the jury.

Although the rule is that evidence of other crimes is generally incompetent in a criminal trial, that rule is subject to the exception that permits such testimony if the other crime is so interwoven with the crime on trial as to make it necessary and appropriate to mention it. Salisbury v. Commonwealth, Ky., 417 S.W.2d 244 (1967); Kemp v. Commonwealth, 314 Ky. 57, 234 S.W.2d 144 (1950); 6 Ky.Digest, Criminal Law, ■■■. In this context, references to the killings of Mr. and Mrs. Bell and the robbing of their store would have been competent as integral parts of one continuous transaction. Undoubtedly it would have been improper for evidence to be presented relating to the shooting and robbing of Hampton and the breaking and entering of the social security office, and none was offered on the trial. The jurors stated on oath that they would not be affected by anything they had read or heard about the case, and the court is unwilling to assume that their answers in this regard were false. The principles enunciated in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), do not require reversal here. The showing of adverse publicity in the present case was far less than what was shown in those cases.

Secondly, it is urged that the trial judge committed reversible error by accepting appellant's guilty plea without first determining that the plea was made voluntarily with understanding of the nature of the charge. Reliance is had upon Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). Further reference should be made to Lucas v. Commonwealth, Ky., 465 S.W. 2d 267 (1971), and RCr 8.08, as well as to Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), and the annotation entitled Validity of Guilty Pleas —Supreme Court Cases, 25 L.Ed.2d 1025 et seq. It is significant that in *Brady,*

Footnote 4, 397 U.S. 742, 747, 90 S.Ct. 1463, 1468, it was observed:

"The requirement that a plea of guilty must be intelligent and voluntary to be valid has long been recognized. See nn. 5 and 6, infra. The new element added in Boykin was the requirement that the record must affirmatively disclose that a defendant who pleaded guilty entered his plea understandingly and voluntarily. This Court has not yet passed on the question of the retroactivity of this new requirement."

RCr 8.08, which is patterned after Federal Criminal Rule 11, prescribes in part:

"The court may refuse to accept a plea of guilty and shall not accept the plea without first determining that the plea is made voluntarily with understanding of the nature of the charge."

The rule does not specify that the trial court must make a record of the proceedings wherein the court judicially determines that the defendant's plea of guilty is being made voluntarily and understandingly. *Boykin,* supra, adds that requirement.

In the present case the transcript of evidence reflects the following proceedings:

"The Court:

Let the defendant stand up.

Does he waive formal arraignment?

The Hon. Ben B. Wright: (Counsel for Defendant)

Yes, sir.

The Court:

Does he acknowledge identity of Person?

The Hon. Ben B. Wright:

Yes, sir.

The Court:

How does he plead?

The Hon. Ben B. Wright:

He will enter his own plea, Judge.

The Court:

How do you plead, Mr. Caldwell?

Defendant—Warren Nathaniel Caldwell:

Guilty.

The Court:

You plead guilty?

Defendant—Warren Nathaniel Caldwell:

Yes, sir.

The Court to the Clerk:

Call a jury."

No other record of the court's personal inquiry of the defendant pertaining to whether the guilty plea was voluntarily and understandingly made appears in the transcript of evidence. However, the trial order entered on October 23, 1970, subsequent to the trial, recites the following:

"This case having come on for trial and the attorney for the Commonwealth and the attorney for the County having announced ready and the attorneys for the defendant having announced ready and the defendant having waived formal arraignment and acknowledged identity of person, the court then asked the defendant how he wished to plead to the charge and the defendant personally replied, 'Guilty.' The court then asked the defendant, 'Do I understand that you wish to plead guilty?' to which the defendant replied in the affirmative.

"Subsequently, the court asked the defendant if this plea was his personal decision, if it was voluntarily entered by him, and if he thought his attorneys had advised him properly. The defendant answered all of said questions affirmatively.

The court then ordered the clerk to proceed to impanel a jury and there were drawn and selected as jurors * * *."

The rest of the trial order recites in chronological sequence the events and proceedings that were had, concluding with the re-

port of the jury's verdict, the polling of the jury, and the discharge of the jury.

On February 12, 1971, which was long after motion and grounds for new trial had been overruled and after the notice of appeal had been filed on November 17, 1970, but before the appeal had been perfected by a filing of the record in this court, the attorneys for the appellant moved the court to delete the second paragraph of the trial order as above quoted so as to bring it into conformity with the official transcript of proceedings. Attached in support of the motion were affidavits of both the attorneys who had been appointed for Caldwell, in which each deposed "to the best of his knowledge and belief that the events outlined in paragraph two of the Trial Order did not occur in his presence, nor was he so informed." Neither the Commonwealth nor the trial judge made any response or countervailing affidavit, but an order was entered February 17, 1971, in which the court noted that the motion to correct the trial order had been filed and that affidavits in support of it had been carefully considered. The motion was overruled.

It is plain that *Boykin* established the rule that a record must be made of the judicial proceedings wherein the trial judge determines that a plea of guilty was made voluntarily and understandingly. The trial order subsequently entered by the court provides such a record, but in view of the apparent absence of counsel at the time the inquiry was conducted this court of its own motion remanded the case to the circuit court with directions to hold an evidentiary hearing and determine whether Caldwell (a) had sufficient mental capacity to understand and did in fact understand the nature of the charge and possible consequences of a guilty plea and (b) nevertheless voluntarily chose to plead guilty. Such a hearing was thereafter had before Hon. Frank R. Goad, Judge of the 49th Judicial District, as special judge, who found under conflicting evidence that Caldwell's guilty plea had been voluntarily and understandingly entered and that he was mentally competent when he entered it.

With respect to the voluntariness of the plea, the finding of the special judge is supported, inter alia, by the testimony of the trial judge and by the notes kept by him during the progress of the trial proceeding. This evidence discloses that the selection of the jury was completed on the afternoon of October 19, 1970, and that the jury was sworn on the morning of October 20, 1970. After the tentative jurors had been excused on the afternoon of October 19, and after all the lawyers had departed from the courtroom, but before Caldwell was taken back to jail for the night, the trial judge called him up to the bench and proceeded as follows:

A—". . . At 4:00 o'clock, after I recessed, that was when I called Mr. Caldwell up to the bench and from my recollection both of his attorneys had left the courtroom and both of you gentlemen had left the courtroom and there was practically nobody up here, except maybe the Jailer and except maybe a Deputy Sheriff, but I called Mr. Caldwell up to the bench at 4:00 o'clock that first day to determine for my own benefit whether his guilty plea was voluntary and whether or not he understood it and whether he had the mental capacity to enter that plea and understand the consequences of it.

Q—"Now, right in that connection, do your notes that you have referred to show anything in that connection, Judge?

A—"Yes, sir.

Q—"What do your notes show?

A—"My notes show that I really entered into sort of a general discussion with Warren Caldwell for the purpose of seeing whether he realized what he was doing.

Q—"Will you just read a portion of your notes referring to that?

A—"My notes say: 'Went through 11.42 questions (4) with the defendant and also 8.08 (that means Criminal Rule 8.08).' What I did, I asked him a series of questions which I always do in a guilty plea.

Q—"What were those questions?

A—"The questions were these: 'Whether it was his personal decision to enter this plea' to which he answered it was; 'whether it was voluntary on his part (that is whether anybody pressured him or in any way forced him to enter a guilty plea) and he said that it was voluntary.' The third question was whether he felt he had been properly and efficiently represented by his attorneys, whether he had any complaint along that line and he said that he felt they had advised him properly and he had no complaint. Then I asked him if he knew that he could plead not guilty and have a jury trial with the assistance of his counsels and he said he did but that he waived the jury trial as far as the guilt or innocence was concerned and entered the guilty plea. Then I just talked to him generally about the thing in addition to those questions and I explained the meaning of the charge; what basic acts had to be proved to show his guilt and I further explained to him that I could not fix the sentence in a capital case for under the rules the jury has to do that and that there were just two possibilities, life sentence or death penalty.

Q—"If I understand you, did you tell him then, in effect, if he entered a plea of guilty he would, nevertheless, have to have a jury trial?

A—"That is correct. That under the law in this state I could not fix the penalty in a capital case that the jury had to fix it and I explained the two alternatives for the jury. During the course of that talk with Mr. Caldwell I had in mind the question of what his mental capacity might be, whether there was any question about that. Of course, I am only a layman but from my own observations and conversation with him I determined that he was competent and knew what he was doing in entering this plea.

Q—"Did he seem to understand, Judge, what you were telling him and what you were asking him and as you say, as a layman, did he seem to respond to you?

A—"He certainly did and struck me as being above average intelligence.

Q—"And he made it clear to you that his entering a plea of guilty earlier was his own choice and was still his desire?

A—"That's true and as Mr. Wright stated in his opening statement, it may have been a surprise to his own attorneys, but it certainly was his own idea.

Q—"Now, Judge, if I understand you, that took place about 4:00 at the end of the first day proceedings, is that correct?

A—"That's true.

Q—"And no testimony had come in at that point?

A—"No evidence, none at all.

Q—"And the jury had not been sworn although they had been tentatively accepted, they had not been sworn to try the issue, is that right?

A—"Let me see what my notes say here. My notes show that I did not swear the jury until the next morning, the 20th.

Q—"So the jury had not been sworn at that time?

A—"No, sir."

█ It was said in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1966), that the principle of Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L. Ed. 158 (1932) and subsequent cases "calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." Ordinarily, we think, an inquiry conducted by the trial court for the purpose of ascertaining whether a defendant understands the nature and consequences of a guilty plea and is acting voluntarily would be considered a critical stage

of the proceeding at which the presence of counsel is desirable if for no reason other than to see that it is properly done. On the other hand, we see no reason to hold that the absence of counsel is immutably fatal, regardless of the attendant circumstances.

■ It is abundantly certain from both the original record and the record of the post-trial hearing ordered by this court that Caldwell had entered his guilty plea against the advice of counsel and that in so doing he was motivated by a belief, based on his personal observation of other cases, that he would thus have a better chance of receiving a life sentence rather than the death penalty. Technically, perhaps, the trial court would have been better advised to see that his counsel were present when he discussed the matter with him on the afternoon of October 19, 1970, but we are inclined to believe that the way in which it was done was more conducive to ascertaining Caldwell's true state of mind than would have been the case if the questions had been put to him under more formal circumstances and in the presence of counsel. After all, counsel had already entreated with him not to plead guilty; indeed, they had declined to do it themselves, and so he had spoken for himself. What the judge did thereafter he did for the purpose of making sure it was what Caldwell really wanted to do, and in order to give him an opportunity of changing his mind. We find in this procedure, in this case, no constitutional violation.

■ *Boykin* apparently stands for the proposition that a silent record on the voluntariness of the guilty plea could not be supplied nunc pro tunc through the office of a subsequent inquiry, either to ascertain the fact or to correct the record. Here, however, the fact was ascertained before the trial commenced and the trial order constitutes a contemporaneous record of its having been done. The subsequent inquiry, as it turns out, merely illuminates and supports the record. We find no inconsistency with the principle of *Boykin*.

■ The appellant asserts that prejudicial error was committed by receiving in evidence a confession made by him to a deputy sheriff of Christian County. He contends it was obtained at a time when he was under the influence of seconal, a barbiturate.

The trial court conducted a hearing out of the presence of the jury respecting the admissibility of the confession. At approximately 12:30 a. m. on August 23, 1970, the sheriff's office had obtained confessions from Harrison Brodie, Jr., Don Henry Mason, and Jerry Watkins, who were jointly indicted with the appellant for the murder of Mr. Bell. Based on the information in those statements and upon other information obtained during investigation of the crime, appellant was arrested at about 3 a. m. on August 23. According to the testimony for the Commonwealth, he showed no sign of being under the influence of any drug or of alcohol. The warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965), were given to him and he signed a voluntary waiver of his right to counsel and his right to remain silent. He did not testify during the in-chambers hearing and offered only evidence of other persons who stated that he had taken several of the barbiturate pills as late as about midnight before he was arrested. The trial judge found as fact that the confession was voluntary, the required warnings had been given, and the constitutional rights guaranteed by *Miranda* had been understandingly and voluntarily waived. This finding by the trial judge was fully supported by the evidence adduced at the in-chambers hearing.

■ Pursuant to the court's ruling the Commonwealth was permitted to and did introduce the confession. The defense offered no evidence before the jury tending to put in issue its admissibility. The record on appeal does not contain the instructions

offered by the court, but it is contended that the court omitted the admonition required in Bradley v. Commonwealth, Ky., 439 S.W.2d 61 (1969), to the effect that the jury should not consider the confession without finding beyond a reasonable doubt that it was freely and voluntarily given. Every detail contained in the confession was completely corroborated by independent evidence presented by the Commonwealth. We are of the opinion that failure to admonish or instruct the jury with respect to the confession was not prejudicial.

The last attack upon the judgment is predicated on claimed prejudicial argument by the Commonwealth's attorney in his summation to the jury, as follows:

"This is an afterthought—an afterthought about these pills. Who said anything about it? Warren Caldwell didn't say anything that he took any pills. You didn't hear him testify about taking any pills. All you heard was his mother who testified about him taking some pills and that girl that he was shacked up with and lying with down there that night after he had killed these old people."

It is contended for appellant that the statements of the prosecuting attorney violated Section 11 of the Kentucky Constitution, as well as KRS 421.225 which provides that the failure of the defendant to testify shall not be commented upon. Bradley v. Commonwealth, Ky., 261 S.W.2d 642 (1953), and Hicks v. Commonwealth, 311 Ky. 492, 224 S.W.2d 916 (1949), are cited by the appellant in support of his argument on this point. The comments of the Commonwealth's attorney were perilously close to a violation of the constitutional and statutory safeguards against self-incrimination, but considering the overwhelming evidence we are convinced beyond any reasonable doubt that this particular argument was of negligible and nonprejudicial import.

In view of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), that portion of the sentence calling for the appellant's execution shall be suspended indefinitely.

The judgment is affirmed.

All concur excepting NEIKIRK, J., who did not sit.