Kevin N. STANFORD, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

Supreme Court of Kentucky.

April 30, 1987.

As Modified on Denial of
Rehearing Sept. 3, 1987.

Frank W. Heft, Jr., Chief Appellate Defender, Louisville, Daniel T. Goyette, Jefferson Dist., Public Defender, for appellant.

David L. Armstrong, Atty. Gen., David A. Smith, C. Lloyd Vest II, Asst. Attys. Gen., Frankfort, for appellee.

## OPINION OF THE COURT

Kevin Stanford appeals from his sentence of death imposed by the Jefferson Circuit Court following a jury trial in which he was found guilty of murder, first-degree sodomy, first-degree robbery, and receiving stolen property over $100. The appellant, a 17–year-old juvenile at the time of his criminal deeds, raises numerous issues in his appeal: some are preserved, others are not. As this Court announced in *Ice v. Commonwealth,* Ky., 667 S.W.2d 671, 674 (1984), all prejudicial errors "must be considered, whether or not an objection was made in the trial court." Therefore, this opinion will concern itself only with the merits of the appellant's arguments and will not disregard a claim of error for lack of objection unless it is apparent that the failure to object was a deliberate trial tactic.

On the evening of January 7, 1981, Baerbel Poore was repeatedly raped and sodomized during and after the commission of a robbery at the Checker gasoline station on Cane Run Road in southwestern Jefferson County where she was employed as an attendant. The proceeds of the robbery consisted of approximately 300 cartons of cigarettes, two gallons of fuel and a small amount of cash. Following the robbery Ms. Poore was taken from the station and driven a short distance to an isolated area where she was shot twice, once in the face and once, fatally, in the head.

Based upon information obtained from a juvenile reported to be selling cigarettes and from rumors at the apartment complex near the scene of the crime where appellant resided, the police arrested Stanford on January 13, 1981. Stanford gave the police a statement, subsequently suppressed, which implicated Calvin Buchanan as the major wrongdoer in the commission of these crimes. Calvin, having no desire to return to prison from where he had recently been paroled, denied any participation in the crimes and allowed the police to tape record a conversation with his nephew, David Buchanan. During that conversation, David exonerated Calvin while admitting his involvement and that of the appel-

lant in the crimes. David Buchanan was arrested on January 16, 1981. Following his arrest he gave the police a statement in which he confessed to rape, sodomy and robbery, and implicated Stanford as the triggerman and perpetrator of the crimes. He also implicated a third juvenile, Troy Johnson, who supplied and drove the getaway vehicle and who obtained the gun used by Stanford in the murder.

In October, 1981, following a waiver hearing, the Jefferson District Court found it was in the "interest of the community and in the interest of the child that Kevin be transferred to Circuit Court and tried under the ordinary laws governing crime."

Motions for separate trials were denied and the two were tried in August, 1982. The Commonwealth originally sought the death penalty against both defendants, but prior to trial it did not object to Buchanan's motion to exclude the application of the death penalty as to him. Buchanan received a life sentence and his conviction was upheld in his appeal to this Court.[1] Other facts will be recited as necessary for an understanding of the issues raised in this appeal.

■ Stanford has raised several issues in regard to the jury selection process. The procedure the trial court used was the optional method of interviewing prospective jurors individually in chambers concerning the two threshold issues of pretrial publicity and ability to consider the death penalty. The court ruled it would ask only one question concerning the death penalty issue and would not allow rehabilitation by counsel of those jurors who expressed an inability to impose the death penalty. The defendants' attorneys submitted a list of nearly 30 questions which the court declined to ask. Instead, each potential juror was asked the following question by the court: "Do you have any personal convic-

tion against imposing the death penalty, such that you could not consider it under the circumstances *in this* or in any other case and regardless of what the evidence might be"?

The appellant alleges that the emphasized words violated the rule articulated in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), that prospective jurors not be asked "in advance of trial whether he would in fact vote for the extreme penalty in the case before him...." *Id.*, 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21. In *Ice, supra*, p. 676, this court likewise held it to be error to question a juror whether he would consider imposing the death penalty in the "particular case before him."

We find no error in the form of the death-qualifying question posed to the jurors as the judge plainly asked each juror about his or her convictions "in this or in any other case," thus encompassing all such situations and not just the case to be tried. Further, the record shows that the judge was careful to explain to the veniremen that he was specifically not asking how they would decide the case at hand. While the death-qualifying question offered by the defendants, (number 24 in the list of 29)[2] may have been better phrased, there was nothing improper or prejudicial about the question asked by the trial court.

Stanford further complains he was denied his constitutional right to a fair trial on the basis that the jury was not selected from a representative cross section of the community. This argument is based on the following three factors: (1) that the court commenced jury selection on the last day of service for those serving in the jury pool, thereby, arguably, creating a jury of volunteers[3]; (2) that on the second day of jury selection the court's procedure of in-

---

1. *See Buchanan v. Com.*, Ky., 691 S.W.2d 210 (1985), cert. granted, 106 U.S. 2245, 106 S.Ct. 2245, 90 L.Ed.2d 691 (1986) (85-5348).

2. 24. Are you so irrevocably opposed to the imposition of capital punishment in every possible case that you would be unwilling to consider all the penalties provided by law and would vote against the penalty of death regardless of facts

and circumstances surrounding such individual cases?

3. The trial court excused twenty-one (21) of the 59 veniremen questioned on the first day of trial for various personal or business reasons proffered by those jurors.

terviewing prospective jurors from the pool in alphabetical order resulted in adding only those people to the pool whose last names began with the letters A–H; and (3) that the jury was death-qualified.

■ We find this argument to be totally without merit. There is no indication that the statute regarding jury selection, KRS 29A.060, was other than strictly complied with. That several were excused for medical, employment or other hardship reasons was a matter within the discretion of the trial court. The court, however, did not excuse all those who expressed a desire to be excused. Those interviewed were not able to "opt in or out at will," a practice denounced in *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir.1977), but had to demonstrate that prolonged service would create undue problems. The procedure utilized by the trial court in the *Kennedy* case was that of securing jurors from lists of those whose term of duty had already expired. The Commonwealth has referred us to *United States v. Anderson*, 509 F.2d 312 (D.C.Cir.1974), the facts of which more closely correspond to those in the instant case, which holds as follows:

> In separating those who could from those who could not afford to expand their service, the judge did not exclude anyone or any cognizable group. The sole criterion he employed was ability to serve longer; the panel from which the jury was drawn was distinguished only by that quality. We think a trial judge's discretion in jury selection is broad enough to encompass consideration of adverse consequences which might be suffered by jurors suddenly called to a duty prolonged materially beyond their original expectations. *Id.* p. 322.

■ The second prong of this argument is truly spurious. The appellant cannot seriously contend that the trial court violated his right to a jury comprised of a fair cross section of the community by interviewing veniremen on the second day in alphabetical order. He has not identified any "distinctive" characteristic possessed by those whose surnames begin with the letters I–Z. *See Ford v. Com.*, Ky., 665 S.W.2d 304, 308 (1983), citing *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Moreover, had the appellant proven or articulated such characteristics, there was no error as more than half of the jurors who actually heard the case had surnames beginning with these letters. It is thus evident that the group was not excluded from the jury. Finally, as pointed out in *Pope v. United States*, 372 F.2d 710, 725 (8th Cir.1967), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968), "[t]he point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn...." Thus, the court's use of a facially neutral procedure in questioning a panel of potential jurors does no harm to a defendant's due process rights.

■ Concerning the exclusion of those opposed to the imposition of the death penalty, such argument was rejected by this Court in Buchanan's appeal. (*See* footnote 1.) Further, the case of *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir.1985) (en banc) relied upon by Stanford, was overruled by the Supreme Court in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), which held as follows:

> "Witherspoon—excludables," or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement.... It is for this reason that we conclude that "Witherspoon—excludables" do not constitute a "distinctive group" for cross-section purposes, and hold that "death qualification" does not violate the fair cross-section requirement."

Stanford further alleges the trial court denied him his right to a trial by an impartial jury by unduly restricting the voir dire examination. We have reviewed the record in light of this claim and find no support for this allegation. That the trial court refused to allow counsel to rehabilitate potential jurors struck for cause due to their

stated inability to consider the death penalty, and further, that it refused to ask each juror during the limited in camera voir dire the exhausting list of questions posed by Stanford and his codefendant, did not in any manner, directly or by implication, hamper or impede the appellant's attorney in his questioning during the general voir dire or limit the scope of such examination at that time.

Simply put, the rulings and discussions of record concerning the list of questions proposed by the defendants never addressed the propriety of asking the questions during the general voir dire.[4] We can find no rulings on the merits of the questions nor any hint of how the court would have ruled had appellant's counsel attempted to ask the questions of the jurors during the collective voir dire. As the trial court did not make any rulings adverse to the appellant during his counsel's questioning of the jury, we can find no error prejudicial to appellant. We do not disagree with appellant that he had a right to life-qualify the jury. In this regard we agree with the Court's holding in *Patterson v. Commonwealth*, 222 Va. 653, 283 S.E.2d 212 (1981). Why, however, counsel chose not to explore "the veniremen's predilection for imposing the death penalty," *id.*, 283 S.E.2d at 215, is a question which cannot be attributed to any action or failing of the trial court.

■ Further, in this regard we find no error in the court's decision to strike for cause the seven jurors who indicated they would not under any circumstances impose the death penalty. These jurors were not excused merely because they "voiced general objections to the death penalty ...," *Witherspoon, supra*, 391 U.S. at 522, 88 S.Ct. at 1777, or "would rather not" impose the ultimate penalty. *People v. Szabo*, 94 Ill.2d 327, 68 Ill.Dec. 935, 447 N.E.2d 193 (1983). Instead, the seven expressed in clear words that their attitudes were such

that they could not impose the death penalty regardless of the circumstances presented. There was no equivocation as appellant would lead us to believe. The court's decision to strike the seven for cause was thus appropriate under the standard articulated in *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2326, 65 L.Ed.2d 581, 589 (1980). In that case the Court concluded that only one whose views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" could be excluded from the jury. As explained in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), "[t]he quest is for jurors who will conscientiously apply the law and find the facts. That is what an 'impartial' jury consists of...."

The appellant is correct that one may not be struck for cause merely because he would hesitate to vote for the death penalty, or has religious or philosophical qualms about imposing the penalty. Such "qualms" are to be expected. *People v. Szabo*, 68 Ill.Dec. at 949, 447 N.E.2d at 207. The appellant is not, however, aided by the cases cited for this proposition as, stated hereinbefore, the court did not strike any who were ambivalent. Further, the court correctly and properly inquired of those who initially expressed doubts whether or not it would be "impossible" for them to decide on the death penalty "regardless of the evidence." Only those who affirmatively stated it would be so impossible were excused for cause. The appellant criticizes the trial court for making such inquiry, arguing that in so doing the court gave the jurors "an opportunity to escape making a difficult decision," and in effect told jurors "how to avoid serving on the case." We believe, however, that had the court failed to ascertain the extent of the jurors' views on the subject it would not have obtained the crucial information required by *Adams*,

---

4. It is easy to understand why the court declined to ask the questions during the individual voir dire. Not only was the list lengthy but several of the questions were so broad in nature that it could easily have taken several weeks to complete the individual voir dire. For example, question 5 asked, "How do you feel about the

death penalty being a deterrent of crime"? Question 7(b) read, "What is your definition of reasonable doubt"? We note that these specific questions were not relevant to the issue at hand, that is, that of a juror's ability to be impartial, although others were more to the point.

that is, whether their views were such as would impair their performance or duties as a juror.

That potential jurors may take probing questioning as an opportunity to sidestep their civic duty is a problem inherent in the jury selection process. That such actually occurred is a matter not likely to be evident from the record. Thus, it is incumbent upon us to trust in the impressions of the trial court. As remarked in *Wainwright:*

> Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.,* 105 S.Ct. pp. 852–853.

Concerning juror Harkess, whom the court refused to strike for cause, the court was satisfied, as are we, that she could decide the case solely on the evidence presented in court and not from media accounts. The judge found she could be "open minded" and we find nothing in her responses to the court to determine otherwise. Lastly in this category, any prejudice caused by the prosecutor's remarks concerning reasonable doubt during voir dire was cured by the court's admonition.

■ The most serious issue in the appeal, we believe, is the appellant's allegation that he was denied a fair trial because of the court's refusal to grant his motion for a separate trial and/or by the court's failure to exclude during the trial the confession of his nontestifying codefendant, Buchanan.[5] This confession implicated Stanford as the triggerman in the murder and as a participant in the other crimes. The court ruled that it could "protect" Stanford by sanitizing the confession, that is, by not allowing Stanford's name to be mentioned by the witness, Detective Hall, to whom Buchanan confessed. Instead, he was consistently referred to as "some other person." As Hall related that Buchanan's expressed reason for confessing was to clear his uncle Calvin, and as Troy Johnson was referred to by name, the "other person," considering all the other evidence at trial, Stanford argues, could only have referred to him. Nevertheless, we believe the editing of his name from the confession was sufficient to protect his right to cross-examine inculpating witnesses, a right provided by the Confrontation Clause of the Sixth Amendment. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

■ Even if the admission of Buchanan's statement did constitute an error, it is subject to "harmless-error analysis," *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674, 686 (1986), *see also Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), and our inquiry thus becomes whether the "error was harmless beyond a reasonable doubt." *Delaware,* 475 U.S. at p. ——, 106 S.Ct. at p. 1438, 89 L.Ed.2d at p. 686; *Lowe v. Commonwealth,* Ky., 487 S.W.2d 935 (1972).

■ Certainly Buchanan's confession was cumulative and, although not insignificant, it did not have the devastating quality as other direct evidence of Stanford's guilt, particularly that of his own extra-judicial admissions,[6] the testimony of Troy Johnson

---

**5.** Stanford additionally alleges he was entitled to a separate trial because the trial court's ruling which granted Buchanan's motion to exclude the death penalty as to him, a motion not objected to by the Commonwealth, amounted to a judicial usurpation of the jury's fact-finding role. That the Commonwealth decides to seek the death penalty against a defendant in a joint trial with a codefendant who is not death eligible does not "strip" the jury of its function in determining which defendant, if either, is ultimately responsible for the commission of the crime as charged. To accept Stanford's argument in this regard would preclude the state from ever trying defendants jointly when one is charged with a higher degree of culpability than the other.

**6.** Stanford told Richard Reetzhe that he would blow his brains out "just like the girl." He bragged to other juveniles while in the detention center that, "I made her suck my dick," and "we fucked her in the bootie." He explained to Michael Nally that, "I had to shoot her, the bitch lived next to me and she would recognize me."

and the physical evidence including his pubic hairs on various parts of the victim's body, and his fingerprints on the car. Considering all this other evidence before the jury, we believe the error in this case to be harmless. As the Supreme Court remarked in *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340, 345 (1972), "Judicious application of the harmless-error rule does not require that we indulge assumptions of irrational jury behavior when a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instruction, stares us in the face."

The next group of alleged errors concerns various rulings of the trial court on evidentiary matters. First the appellant asserts that the admission of his remarks to Michael Nalley, a corrections officer at the detention center, constituted a violation of his Fifth and Sixth Amendment rights not to incriminate himself and to be represented by counsel. Nalley, who heard Stanford bragging to others in the center about his misdeeds,[7] was asked by the appellant, in a conversation initiated by appellant, how much time he (Nalley) believed Stanford would have to serve for the crimes. After discussing how long and where he would serve, Nalley asked Stanford why he resorted to killing the victim of his sexual attacks. Nalley's testimony of Stanfords's response is as follows:

> [H]e said, I had to shoot her, the bitch lived next to me and she would recognize me. And then, in a laughing manner, Mr. Stanford went on and he continued, he said, I guess, we could have tied her up or something or beat the piss out of her ... and tell her if she tells, we would kill her.... Then after he said that he started laughing and I just shook my head, and just continued to watch TV and didn't say anything else.

This conversation occurred several days after Stanford was placed in the detention center and advised of his rights. He insisted Nalley should have re-advised him of these rights, particularly his right not to be interrogated without counsel and that his failure to so warn required the suppression of Nalley's testimony. We do not agree.

In *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), relied upon by the trial court, the Supreme Court held that one who had asserted his right to be represented by counsel could not be interrogated further "unless the accused himself *initiates* further communication, exchanges or conversations with the police." There is no question, by asking the officer's opinion about the sentence he would receive, that Stanford "initiated" further conversation. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). Considering the totality of the circumstances including the fact that he initiated the conversation, the question is whether the appellant validly waived his right to silence and to have counsel present. *Id.*, 462 U.S. at 1046, 103 S.Ct. at 2835. This question was answered adversely to the appellant by the trial court following the suppression hearing and the record supports its finding that the statement was voluntarily made. Stanford knew exactly who Nalley was. There was no evidence that he had any reason to believe his remarks to Nalley would be treated confidentially. Nalley certainly did nothing to keep Stanford from exercising his constitutional rights.

There is simply no merit to any of the other issues concerning the admission of evidence and we will not belabor this opinion by discussing each one individually. The findings of the trial court contained in its opinion and order in regard to the appellant's motion to suppress are supported by the record and its legal determinations are sound.

Stanford alleges that the trial court committed substantial error in violation of the Eighth and Fourteenth Amendments and Sections 11 and 17 of our Kentucky Constitution by excluding mitigating evidence offered by the defense during the penalty phase of the trial. This assignment of error warrants more than passing comments by us.

7. See footnote 6, *supra*.

During the penalty phase of the trial, Robert Jones, a former death row survivor, was called as a defense witness. Jones, at the time, was a supervisor for the (Louisville) Mayor's Summer Youth Program. He had experience with various programs dealing with youths on a counseling basis although he holds no academic or professional credentials. He was also vice-chairman of the Kentucky Coalition Against the Death Penalty. In that capacity he testified that he traveled about speaking to groups and conducting seminars against the death penalty. He claimed to be demonstrative evidence that one can be rehabilitated.

The trial court excluded his testimony before the jury. Jones' opinion, preserved by an avowal of why Kevin Stanford should not be executed is, partially, as follows:

Q And, sir, could you tell me your unique relationship with the death penalty?

A Well, at one time, I was on death row myself.

Jones related that in 1978 and 1979 he became familiar with Kevin Stanford while a youth counselor at a children's detention center. He talked with him again within a week before the trial began. Jones' avowal testimony continues:

A Yes, sir. I feel that Kevin need to be in an adult institution where the rehabilitation program and the proper training is a lots greater than it is in the juvenile facilities. I think that Kevin need discipline. I think that that Kevin's biggest problem is the lack of discipline in his life as a youth.

. . . .

A Sir, I truly feel that the death penalty is not appropriate for anyone I guess because my own personal experience that I've had. I am against capital punishment 1000% and I realize that even if Kevin was guilty of the crime, it's not going to bring the victim back. I feel that with his young age, that this man can be rehabilitated. And, if a 17 or 18 year old cannot be rehabilitated, then

this is a failure in our correction department instead of the individual.

. . . .

I feel that this young man should be given this opportunity to place him in the Department of Corrections with the proper type of counseling. Now, I've heard that Kevin had a drug problem. There's no difference between a drug problem and an alcoholic problem.

. . . .

Q Do you think being in the penal population and being with the population in a penal system will affect Kevin?

A Mentally, yes, sir.

Q How will it affect him?

A I feel that Eddyville will make him or break him. And, I feel with the type of program that they have at Eddyville that he'd never been exposed to in a juvenile facility, that this is another thing, he would have an opportunity to get a GED; he'd have an opportunity to get him a college education; he'd have an opportunity to get into so many type of vocational training and I think that this is what Kevin needs.

. . . .

Q Do you think a life sentence would wake him up to that fact?

A The life sentence is going to wake him up and the maximum security environment will wake him up.

Stanford argues that the exclusion of Jones' mitigating testimony was error of constitutional magnitude. We disagree and sustain the trial court ruling. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), sets the constitutional perimeters for dealing with the reception into evidence before a trier of fact of mitigating circumstances. The Supreme Court comments:

[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer [herein the jury], in all but the rarest kind of capital case [footnote omitted], not be precluded from considering *as a mitigating factor*, any aspect of a defendant's *character* or *record* and any of the *circumstances of the offense* that the defendant proffers as a basis for a

sentence less than death. [Here referring to footnote 12: "Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense"]. [Last three emphases ours.] KRS 532.025, our death-qualifying statute, provides in part that after a conviction of a crime for which the death penalty may be imposed by jury, the trial shall resume and the prosecuting attorney shall open and the defendant shall conclude the evidence and arguments. The statute says that the judge or the jury shall consider "any mitigating circumstances or aggravating circumstances otherwise authorized by law" and any of the eight statutory circumstances of mitigation.

The thrust of the claim of error was that the trial court erred in not allowing the jury to hear the testimony of Robert Jones because *Lockett, supra,* through the Eighth and Fourteenth Amendments, requires that the sentencing body consider any relevant evidence offered by the defense in mitigation of capital punishment. Further, KRS 532.025 authorizes the sentencing body to consider "any mitigating circumstances otherwise authorized by law."

*Lockett* expresses the minimum factors of what is admissible in complying with the Eighth and Fourteenth Amendments. The factors are the defendant's character, prior record and circumstances of the offense. KRS 532.025 is more expansive in that it spells out eight circumstances of mitigation that are relevant, and it contains a catch-all provision, "any mitigating circumstances otherwise authorized by law." This provision would permit the trial court to submit any redeeming evidence to the jury. However, we believe the evidence must contain facts or a qualified opinion bearing on the defendant's character, prior record or circumstances of the offense, or relative to one of the specified statutory mitigating circumstances.

 Utilizing this standard, a review of Robert Jones' proffered testimony shows that it was clearly inadmissible. He had no academic or professional qualifications to allow him to offer opinion evidence. His personal knowledge of Stanford was at best minimal and remote. What very little of his testimony which might conceivably be admissible, such as the rehabilitative prospects of the defendant, was cumulative. The main theme of his testimony concerned his own philosophy about the value of the death sentence. We say clearly that was not admissible. The penalty phase of the trial is not an open forum for the expression of one's personal philosophical beliefs concerning the propriety of the death penalty. If permitted, the Commonwealth could offer rebuttal testimony about the moral righteousness of the death penalty, the result being that the jury would be bombarded with philosophical and moral opinions, none of which are relevant to the decision it must reach. *See Ice v. Com.,* Ky., 667 S.W.2d 671, 676 (1984). The trial court acted properly by excluding Robert Jones' testimony.

 Stanford alleges that prejudicial error resulted when the prosecutor inquired during cross-examination of the appellant's stepfather whether he was aware that the victim was the mother of a small child. George Boller, appellant's stepfather, made a statement as a defense witness on cross-examination that the appellant was going to straighten his life out because he had a child. The prosecutor retaliated by asking Boller if he was aware that the victim had an eleven-month-old child. The matter was objected to and a motion for mistrial was lodged. The prosecutor claimed he was entitled to bring the matter out because Boller had opened the door by making a statement about the appellant's child. The trial court overruled the objection and motion for mistrial but gave the jury an admonition to disregard the nature of the information.

 The statements have no relevancy or probative value and would, without question, have been suppressed if the trial court had been forewarned. Regardless, because the statements were injected before the jury, was the appellant denied a fair trial? We say no. The trial court kept

the jury's mind in proper perspective with the admonition. It cured any inflammatory nature of the statement and we see no substance or reversible error pertaining to it. We simply comment that a trial of this magnitude will invariably be marred with occasional minor or surface knicks which, when cured by the trial court, cause no substantial error.

Stanford alleges the prosecutor's closing argument in the penalty phase deprived the appellant of his right to a fair trial consonant with due process of law, as guaranteed by the Kentucky and United States Constitutions, and introduced arbitrary considerations into the jury's decision-making process.

We can see where there was no objection by trial counsel on behalf of the appellant to the prosecutor's remarks because his remarks were so unclear as to be barely intelligible even under our close scrutiny. Such remarks, in our opinion, could hardly mislead anyone hearing them. Therefore, we are not persuaded by appellant's argument and do not read into the prosecutor's remarks that which the appellant reads into them. The prosecutor told the jury that appellant showed no remorse for his crime. The appellant argues that had he shown remorse by outburst before the jury, then the prosecutor would have contended that it was contrived. This assignment of error is so baseless it warrants no further discussion. As in *Marlowe v. Com.*, 709 S.W.2d 424, 431 (1986), we believe the jury would have returned the same sentence regardless of the comments complained of.

■ The appellant has devoted a substantial portion of his brief to his assertion that KRS 208.170 was applied in an unconstitutional manner in the process leading to the juvenile court's waiver of jurisdiction over him.[8] He makes two arguments in support of this claim: (1) that the statute is applied in a racially discriminatory manner and (2) that he was found by the district court to be amenable to treatment.

Stanford has compiled a barrage of statistics in an attempt to persuade us that black youths were treated disproportionately under this statute in the juvenile division of the Jefferson District Court. The most disturbing statistic presented by Stanford is that of 56 grand jury referrals in the years 1975 through 1979, 68% were black juveniles, a group, according to the appellant's statistics, that comprised only 30% of the total number of referrals to juvenile court. He thus concludes that, although white juveniles committed twice as many offenses as blacks, they were referred to the grand jury at a rate of only half that of their black counterparts. We do not believe, however, that these statistics warrant the conclusion that race is in any way a factor in the waiver process.

It is quite possible that the percentages of grand jury referrals can be rationally explained by Stanford's figures which show black youths committed more than half of all the homicides and robberies and nearly half the assaults and rapes. More to the point, though, we find these statistics to be inadequate in drawing any conclusions bearing on this issue. For example, a factor not included in the appellant's analysis and one we believe crucial in order to find appellant to have set forth a *prima facie* case of racial discrimination in this context is the percentage, if any, of the 56 grand jury referrals that comprise repeat offenders, those, like Stanford, for whom the state's previous attempts to rehabilitate proved unsuccessful. We are not at all persuaded by Stanford's statistics and find no evidence whatsoever to convince us that Stanford or any other juvenile was directly or indirectly the victim of racial discrimination in waiver proceedings before the Jefferson District Court.

■ The second aspect of this allegation of error concerns the district court's finding of Stanford's amenability to treatment. Specifically the district court found that Stanford was "emotionally immature and *could be* amenable to treatment if properly done on a *long term basis* of psychotherapeutic intervention and reality based therapy for socialization and drug therapy in a residential facility." (Emphas-

---

8. Stanford concedes that the statute is facially valid.

es added.) The court further found that such a facility did not exist in this state and concluded that it did not have authority to require the state to provide institutionalization outside the state or, importantly, the authority to keep Stanford institutionalized "for the length of time sufficient to provide such intervention reasonably calculated to provide rehabilitation. . . ."

The thrust of Stanford's argument is that "the state has an obligation not to execute a juvenile who is deemed to be amenable to treatment but for whom the state offers no appropriate treatment program," and that imposing the death penalty violates the state and federal constitutional prohibitions against cruel and unusual punishment.

We are not unmoved by Stanford's arguments in this regard. Nevertheless, it is apparent from the record that Stanford has been given the benefit of treatment available to youthful offenders in the Commonwealth on a repeated basis over a period of several years before his involvement in the crimes charged in the instant case. Since the age of ten, Stanford has revolved in and out of juvenile court having committed various offenses including arson, burglary, sexual abuse, theft and assault, to name but a few. We do not know whether the county and state personnel who worked with Stanford in the various facilities in which he was placed are responsible for his failure to be rehabilitated or whether the fault lies within the appellant himself. What is clear, however, from the record and is contained in the district court's waiver order is that there was no program or treatment appropriate for the appellant in the juvenile justice system. Thus, even though he was exposed to the death penalty, the district court did not err in determining that it was in his best interest to be tried as an adult and thereby waiving jurisdiction over the appellant. *Sharp v. Commonwealth*, Ky., 559 S.W.2d 727 (1977). It was certainly not in his best interest, not to mention that of the community, to be committed to a treatment facility from which, after a brief period of time, he would again be free to murder or otherwise harm as he pleased.

Stanford demands that he has a constitutional right to treatment. We hold that he has already had all the treatment the Commonwealth can provide. No less than three times in his brief he has reminded us of the previous observation of this Court, that "incorrigibility is inconsistent with youth." *Workman v. Com.*, Ky., 429 S.W.2d 374, 378 (1968). However, as we more recently recognized in *Ice v. Commonwealth, supra*, at p. 680, the reality, at times, is to the contrary.

In sum, the waiver statute was appropriately followed and not unconstitutionally applied to the appellant. His age and the possibility that he might be rehabilitated were mitigating factors appropriately left to the consideration of the jury that tried him. We do not believe the penalty to be inconsistent with any constitutional protections or requirements.

 We have addressed the merits of all the issues we believe to be of any legal significance. Stanford has raised others which simply do not warrant detailed discussion. For example, he argues there was insufficient evidence to support his conviction for sodomy. Considering the position of the victim's body, that she was partially nude, that she incurred severe bruising to her anus and that the appellant's pubic hairs were found on her bare thigh as well as on other parts of her body or clothing, not to mention his statement to others repeated elsewhere in this opinion that he required her to perform both oral and anal sodomy, there can be no serious contention that there was not sufficiency of evidence to submit this charge to the jury under the standard set forth in *Commonwealth v. Sawhill*, 660 S.W.2d 3 (1983). Likewise, appellant's claim that the police lacked probable cause to arrest him is frivolous. The police arrested Stanford after being informed by another juvenile who was caught selling stolen cigarettes that the cigarettes had been obtained from Stanford who admitted stealing them from the Checker station.

The remaining assignments of error are unpersuasive, not because of their argu-

ment but because of their lack of legal substance. Because of that we will not comment upon them.

■ Finally, as in all capital cases, we have reviewed the sentence as required by KRS 532.075. As we stated in *Matthews v. Com., supra* at p. 424, it is difficult to compare one murder case with another. However, we have no difficulty in stating that the sentence in the instant case is neither excessive nor disproportionate to the penalty imposed in similar cases.[9]

The judgment of the Jefferson Circuit Court is affirmed.

STEPHENS, C.J., and GANT, LAMBERT, STEPHENSON, VANCE and WINTERSHEIMER, JJ., sitting.

All concur.

---

9. We have compiled data since 1970 in those cases where a death penalty has come before this Court for review, considering both aggravating and mitigating circumstances in those cases and comparing them with the present case. The cases we have considered are:

1) *Halvorsen & Willoughby v. Commonwealth,* 730 S.W.2d 921 (decided December 18, 1986).
2) *McClellan v. Commonwealth,* Ky., 715 S.W.2d 464 (1986).
3) *Bevins v. Commonwealth,* Ky., 712 S.W.2d 932 (1986).
4) *Marlowe v. Commonwealth,* Ky., 709 S.W.2d 424 (1986).
5) *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1986).
6) *Holland & James v. Commonwealth,* Ky., 703 S.W.2d 876 (1986).
7) *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384 (1985).
8) *Ward v. Commonwealth,* Ky., 695 S.W.2d 404 (1985).
9) *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985).
10) *Harper v. Commonwealth,* Ky., 694 S.W.2d 665 (1985).
11) *White v. Commonwealth,* Ky., 671 S.W.2d 241 (1984).
12) *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519 (1984).

13) *Ice v. Commonwealth,* Ky., 667 S.W.2d 671 (1984).
14) *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980).
15) *Smith v. Commonwealth,* Ky., 599 S.W.2d 900 (1980).
16) *Hudson v. Commonwealth,* Ky., 597 S.W.2d 610 (1980).
17) *Boyd v. Commonwealth,* Ky., 550 S.W.2d 507 (1977).
18) *Meadows v. Commonwealth,* Ky., 550 S.W.2d 511 (1977).
19) *Self v. Commonwealth,* Ky., 550 S.W.2d 509 (1977).
20) *Lenston v. Commonwealth,* Ky., 497 S.W.2d 561 (1973).
21) *Scott v. Commonwealth,* Ky., 495 S.W.2d 800 (1973).
22) *Tinsley v. Commonwealth,* Ky., 495 S.W.2d 776 (1973).
23) *Galbreath v. Commonwealth,* Ky., 492 S.W.2d 882 (1973).
24) *Caine v. Commonwealth,* Ky., 491 S.W.2d 824 (1973).
25) *Caldwell v. Commonwealth,* Ky., 503 S.W.2d 485 (1972).
26) *Leigh v. Commonwealth,* Ky., 481 S.W.2d 75 (1972).
27) *Call v. Commonwealth,* Ky., 482 S.W.2d 770 (1972).