Leif HALVORSEN, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

Mitchell L. WILLOUGHBY, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

Supreme Court of Kentucky.

Dec. 18, 1986.

As Modified on Denial of Rehearing
July 2, 1987.

Donna Boyce, Kathleen Kallaher, Asst. Public Advocates, Frankfort, for appellant Halvorsen.

Larry H. Marshall, Edward C. Monahan, Asst. Public Advocates, Frankfort, for appellant Willoughby.

David L. Armstrong, Atty. Gen., David A. Smith, Rickie L. Pearson, Asst. Attys. Gen., Frankfort, for appellee.

STEPHENSON, Justice.

Mitchell L. Willoughby and Leif Halvorsen were convicted of three counts of murder. They were sentenced to death on each of two counts and life imprisonment on the third count. Halvorsen was additionally convicted of carrying a concealed deadly weapon for which he was sentenced to twelve months' imprisonment and fined $500. We affirm.

The bodies of Joe Norman and Joey Durrum were found on the side of the Brooklyn Bridge on the Jessamine-Mercer County line. The body of Jacqueline Greene was found in the Kentucky River below the bridge. Each of the victims had been shot to death. David Warner, who lived on the Jessamine County side of the Brooklyn Bridge, became suspicious when he noticed a light blue Ford van and a dark pickup truck lurking at various points around the bridge. At one point, the pickup truck parked on the bridge, a person got out of the passenger side, and Warner heard a big splash. Forty-five minutes later, Warner heard a noise that sounded like a car hitting a guardrail or a sign. He looked out to see the blue van and the pickup truck speeding off across the bridge toward Lexington. Warner called the police.

When the police arrived, they found two of the victims on the side of the bridge, each bound with a blue-and-yellow rope that was attached to a heavy rock. The third victim was found in the river below the bridge, wrapped in a sheet that was also bound with a blue-and-yellow rope and attached to a heavy rock. A traffic sign near the bridge had been knocked over by a vehicle. It had paint smears on it and broken glass lying at its base.

Officer William Foekele testified that around 1:30 p.m., on January 13, he was on Loudon Avenue in Lexington, looking for a car involved in another investigation, when he noticed a blue Ford van stopped at 215 Loudon Avenue. He wrote down the van's license number. On the following day, police learned that two of the victims had lived in the house at 215 Loudon Avenue. A truck belonging to the third victim was found parked at the house. When police entered, they found blood at various places in the house.

Upon learning that a blue Ford van was seen in the area where the bodies were discovered, Officer Foekele suspected that it was the same vehicle which he had seen near the house at 215 Loudon the day before. A registration check revealed that the van was registered to Halvorsen. Foekele then went to Halvorsen's home but saw no vehicles in the driveway. A neighbor indicated that two men and a woman had just left in a blue pickup truck and would probably return shortly. Police staked out all routes to the house, located and cornered the truck, and demanded that its occupants exit. The driver, Mitchell, jumped out immediately. Halvorsen, after hesitating, slid out of the passenger side. The officers found a .38–caliber revolver where he had been sitting. As the officers approached the truck, the woman, Susan Hutchens, threw her hands up and said, "The gun's in my purse." A 9–millimeter pistol was found sticking out of her purse.

A ballistics expert positively identified several of the projectiles recovered from the victims' bodies as having come from the revolver and semi-automatic pistol found in the truck. Two 9–millimeter shell casings were additionally recovered at 215 Loudon. Fingerprints from both Willoughby and Hutchens were found on the 9–millimeter pistol. Hutchens' fingerprints were found on the refrigerator at 215 Loudon as well.

Also recovered from 215 Loudon, by the police, was a plastic blue-and-yellow rope identical to that found tied around the victims' bodies. Paint samples taken from Halvorsen's van matched the paint smears found on the highway sign near the bridge. A comparison between pieces of glass taken from a broken headlight on Halvorsen's van and pieces of broken headlight recovered from the base of the highway sign proved them to have come from the same headlight. Lastly, blood samples from Hal-

vorsen's van were positively identified as having come from one of the victims.

At trial, Hutchens testified that in December 1982, she and Willoughby moved into the house at 215 Loudon, and Willoughby was employed by the victim, Joe Norman, to help him remodel the house. Willoughby and Hutchens moved out a month later when Norman refused to pay Willoughby for the work he had done.

Hutchens testified that on January 13 Willoughby and Halvorsen asked her to buy ammunition for their pistols. Later that day, she decided to go visit the victim, Jacqueline Greene, who lived at 215 Loudon with Joe Norman. When she arrived, Willoughby, Halvorsen, and Norman were standing in the driveway talking. Hutchens went into the house where Greene introduced her to the victim, Joey Durrum. Willoughby, Halvorsen, and Norman then came inside when "all of a sudden" the shooting began.

Hutchens put her hands over her face, covering her eyes. She heard numerous shots. When the shooting was over, she opened her eyes to see Willoughby and Halvorsen each wielding a pistol. Norman and Durrum had fallen to the floor. Hutchens then saw Willoughby shoot Greene twice more, since she was still alive. Willoughby and Halvorsen then screamed at Hutchens to begin picking up the shell casings while they dragged the bodies of the victims through the hallway to the back door where they were placed in the van. Later, Halvorsen left in the van, and Willoughby left in the truck to get rid of the bodies.

Willoughby testified at trial in his own behalf that on January 13 he and Halvorsen went to 215 Loudon to smoke marijuana with Joe Norman. He and Norman began arguing about a cold check that Norman had given to him, when Norman poked him in the chest and threatened him with a bayonet. Willoughby then reached for his gun and began shooting. He remembered shooting Norman two or three times but did not remember shooting the other victims.

In his statements, Willoughby took all of the blame for the shootings. Halvorsen did not testify during the guilt phase. The jury found both Willoughby and Halvorsen guilty of the three murder charges, and Halvorsen guilty of carrying a concealed weapon. The penalty phase then proceeded, after which the jury returned verdicts sentencing Halvorsen and Willoughby to life imprisonment for the murder of Norman and to death for the murders of Greene and Durrum.

Some of the asserted errors are claimed by both Willoughby and Halvorsen. Each has some individual assertions of error.

Halvorsen asserts that the prosecutor, in the voir dire, emphasized that the jurors' verdict was *merely* a recommendation. Willoughby couched his assertion of error on the point that the prosecutor emphasized that the jury's verdict is *only* a recommendation, all of this to many of the jurors and specifically to eight of the jurors chosen to try the case. The first difficulty with this proposition is that our review of the voir dire does not reveal a single instance of the prosecutor's stating *only recommend* or *merely* a recommendation. Further, this is not argued by either of the appellants. The claimed error is put in terms of counting the times recommend was used during an extensive voir dire. We do not find it useful to engage in a game of counting.

The test is whether the prosecutor so minimizes the role of the jury in imposing the death sentence as to lessen the feeling of responsibility on the part of the jury in reaching such a verdict.

All of the jurors were asked: "Have you ever expressed a feeling that you could not ever give the death penalty?" and "Do you have any religious or moral or conscientious scruples against the imposition of the death penalty?"

As to the eight jurors, the following portrays a portion of the voir dire:

Ann Gish was asked:

Q. Okay. At this point, do you feel that if given an instruction by the Court you would be able to consider the death

penalty as a possible alternative as a sentence?

A. I could consider it, yes.

On cross-examination, Ms. Gish was asked:

Q. You are telling the Court that you could give the death penalty?

A. I think so.

Nell Ferrell was asked on direct examination:

Q. ... you recommend the sentence to a judge if you determine whatever the sentence is, okay you make that recommendation; do you feel that you could consider the death penalty as an option ...?

A. Yes.

Mack Hurt was asked:

Q. Do you feel that you could consider giving the death penalty if you're selected as a juror?

A. I believe I could.

Mable Smith was asked:

Q. Could you impose the death penalty, consider imposing it or recommending it as a penalty if the facts justify it?

A. If the facts justify it—yes.

Louise Maxey was asked:

Q. If you are a juror in a case, in this case, and you believe from the evidence that the defendants are guilty ... and you feel that the murder is such that would justify a death penalty under the kinds of cases that you believe, okay? Could you recommend that yourself?

A. I think I could in that case, yes, sir.

Shirley Munro was asked:

Q. ... Judge Angelucci submits instructions to you which has the law in it and says the penalty is twenty years to life imprisonment or the death penalty, could you consider giving the death penalty depending on what the fact situations were?

A. Yes.

Margaret Barton was asked:

Q. Could you consider recommending the death penalty in this case if the facts warrant it?

A. If the facts warrant it, I could.

On cross-examination, she was asked:

Q. You stated that you could as a juror vote for the death penalty if the facts warrant it?

A. Yes.

Francis White was asked:

Q. ... could you impose that penalty, if you feel the facts justify it?

A. If I sit through the trial, knew they were like with—beyond a doubt guilty, yes.

In *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the prosecutor was found to have minimized the jury's sense of the importance of its role by stressing that its decision was not final since it was automatically reviewable and that, in any event, Caldwell would not be strung up in front of the courthouse within moments of the jury's verdict. Similarly, in *Ice v. Commonwealth,* Ky., 667 S.W.2d 671 (1984), this court ruled improper the prosecutor's statements that the "burden" would rest upon the judge to make the final "decision" as to whether Todd Ice should die, and that in any event, the jurors "are not killing Todd." In *Ward v. Commonwealth,* Ky., 695 S.W.2d 404 (1985), once again, the prosecutor stressed to the jury that after a variety of appeals, the execution might very well not take place.

No such minimizing of the jury's sense of responsibility occurred in this case in the voir dire or the closing argument. In their assertions of error in the closing argument by the prosecutor, they argue that the use of the word "recommend" diminished the sense of responsibility of the jurors as to the death penalty and also that the prosecutor unfairly argued that the death penalty should be given as a much-needed deterrent; and emphasized that the death penalty should be imposed instead of a life sentence.

A reading of the closing argument convinces us that the responsibility of the jurors in recommending the death penalty was not diminished. We are of the opinion there was no reversible error in the closing argument of the prosecutor at the penalty phase of the proceeding.

We note that no objections were made to any of the questions on voir dire for the very good reason there was nothing to object to. This drum beat of complaint about the use of "recommend," which is in the statute and necessarily the instructions, seems to arise in every case. We suggest that the trial court or prosecutor, or both, emphasize to the jurors that the use of the term "recommendation" in a death penalty case does not, in any fashion, diminish or lessen the responsibility of the jury in imposing the death penalty.

■ Both Halvorsen and Willoughby complain about "combination" murder instructions which allowed the jury to find each of them guilty as either a principal *or* an accomplice and then an instruction that stipulated that if the jury was unable to determine in which capacity each defendant had actually participated, the jury could find guilt under this instruction. They particularly complain that the "combination" instruction does not list the elements of principal or accomplice liability. This complaint is without merit since the "combination" instruction specifically refers to, and incorporates by reference, two prior instructions which consecutively listed the elements of principal and accomplice liability. Instructions are proper if, when read together and considered as a whole, they submit the law in a form capable of being understood by the jury. *Thomas v. Commonwealth*, Ky., 412 S.W.2d 578 (1967).

■ Likewise without merit is the contention that the instruction rendered the jury's verdict non-unanimous since it did not require the jury to indicate which crime it was finding Halvorsen or Willoughby guilty of. A verdict cannot be attacked as being non-unanimous where both theories are supported by sufficient evidence. *Wells v. Commonwealth*, Ky., 561 S.W.2d 85 (1978). The nature of the evidence of Willoughby and Halvorsen's participation in the killing of the victims, in our opinion, amply supports either instruction. The death penalty was imposed for the murders of Greene and Durrum. These victims were shot eight and five times, respectively; three wounds on each were character-

ized as lethal. Two pistols of different caliber were involved. Greene had two wounds from a .38 Special and two wounds from a 9–millimeter characterized as fatal. Durrum had a fatal wound from a .38 Special and one from a 9–millimeter. Another fatal wound could not be identified as to the caliber of the gun. Thus it was impossible to determine that either appellant was only a principal or only an accomplice. The instruction conformed to the evidence.

Both Halvorsen and Willoughby complain about the trial court's failure to instruct the jury on wanton murder for the deaths of two of the victims. This argument is without merit, since there was no evidence supporting such an instruction. *Gray v. Commonwealth*, Ky., 695 S.W.2d 860 (1985). These two victims alone were shot a total of thirteen times by both Willoughby and Halvorsen. In view of the number, location, and lethal magnitude of the gunshots, it would have been unreasonable to give a wanton murder instruction.

Both Halvorsen and Willoughby complain that repeated misconduct by the prosecutor during the penalty phase closing argument deprived them of a fair trial. Our examination of the closing argument has convinced us that this complaint is without merit. Brief portions of the argument were irrelevant, but on the whole, the argument was fair comment on the evidence.

Considering the overwhelming nature of the evidence against Halvorsen and Willoughby, including their own admissions, we quote from *Timmons v. Commonwealth*, Ky., 555 S.W.2d 234, 241 (1977), which concluded:

We do not think that the prosecutor's argument exceeded the bounds of propriety, nor do we think that it could have added much fuel to the fire anyway.

The same comment applies here.

Halvorsen complains that the prosecutor's questioning of his codefendant, Willoughby, made "oblique references" to his failure to testify and therefore constituted unfair comment on same. Willoughby was asked a number of questions about matters he had asked Halvorsen or about other

witnesses' statements incriminating Halvorsen. Willoughby simply denied asking questions or could not remember. We do not consider these matters comment on failure to testify, particularly since at this stage of the trial Halvorsen had not elected to decline to take the witness stand.

Halvorsen next complains that the introduction of evidence of other crimes and bad acts prejudiced him to the extent of denying him a fair trial. The "other crimes" and "bad acts" evidence complained of were (1) the testimony of Susan Hutchens that Halvorsen, after the shooting, stamped on a kitten that his daughters had found; (2) the testimony of Glenda Tucker that Halvorsen said he would kill his mother if she saw the van; and (3) Hutchens' testimony that on the day following the shooting, Halvorsen attempted to sell drugs and buy guns.

■ Halvorsen concedes that the testimony about his attempt to buy guns was relevant to prove that he wanted to trade off the .38–caliber pistol that was used to murder the victims but complains that the inclusion of the other details of the sale was unnecessary. The details surrounding the effort by Halvorsen to get rid of one of the murder weapons were necessarily part of a single, inseparable, and concededly relevant transaction. Likewise, the testimony that Halvorsen took drugs and stamped on a kitten immediately after the killing was admissible, since it was incidental to relevant testimony in regard to Halvorsen's activities between the time of the killings and the time he and Willoughby left to get rid of the victims' bodies and other evidence of the crimes. Tucker's testimony about Halvorsen's statement that he would kill his mother arose out of, and was incidental to, relevant testimony regarding Halvorsen's admission to Tucker that he and Willoughby had killed three people. This assertion of error has no merit.

Next, Halvorsen complains that the court gave misleading instructions on Halvorsen's defenses of extreme emotional disturbance and intoxication. There was absolutely no evidence supportive of Halvorsen's complaint that the trial court should have *sua sponte* given the jury instructions on extreme emotional disturbance other than the bare assertion that seeing one of the victims threaten his friend, Willoughby, gives rise to a reasonable inference that he became extremely disturbed.

Halvorsen also complains that while the court properly included his defense of intoxication in those instructions under which he was entitled to such a defense, he was denied the benefit of the defense by the failure of the court to specifically refer the jury to the offenses which it could convict him of if it found him to have been intoxicated.

The instructions under which the intoxication defense was available were clearly set out by language spelling out the elements of the defense. It is a reasonable inference that the instructions which excluded such specific language also excluded the defense. As such, the jury was free to convict Halvorsen under these instructions had it been so inclined to accept his intoxication defense, and no additional instructions were necessary to impress the jury that these offenses were alternatively available had it accepted Halvorsen's intoxication claim. There is no merit to these assertions of error.

We also reject Halvorsen's complaint that the court was required to *sua sponte* instruct the jury on nonstatutory mitigating factors, such as "his stable upbringing in an obviously healthy, caring home."

Likewise without merit is the complaint that the court was required to instruct the jury on Halvorsen's accomplice participation as a mitigating factor. KRS 532.-025(2)(b)(5) allows accomplice participation to be considered as a mitigating factor where such participation is "relatively minor." Emptying a revolver into the bodies of two helpless victims, in our opinion, is not "relatively minor" participation.

■ Willoughby argues that he was denied effective assistance of counsel due to the joint representation provided by the Legal Aid office to himself and co-indictee Hutchens; that an actual conflict of inter-

est existed which affected his lawyer's performance; and that his waiver of multiple representation in district court was not an intelligent waiver.

Willoughby, Halvorsen, and Hutchens were arraigned in district court where each entered a plea of not guilty. Sullivan, a Legal Aid attorney, represented each. Shortly thereafter, Willoughby, represented by Jarrell of Legal Aid, executed a waiver of dual or multiple representation, acknowledging that he was aware that a lawyer from the Legal Aid office also represented his co-indictees, Hutchens and Halvorsen. Later, Halvorsen employed private counsel. Sullivan still represented Hutchens.

In the trial court, all three defendants entered pleas of not guilty under the representation of separate counsel. Counsel for Willoughby and Hutchens were both employees of Legal Aid. Three months after their arraignment, Hutchens pled guilty to lesser charges and testified for the prosecution at trial.

The issue of joint representation and conflict of interest was not called to the attention of the trial court. When the trial took place, Willoughby was represented by Jarrell, the Legal Aid lawyer appearing in district court, and Halvorsen by employed counsel. The fact that Hutchens' counsel, also of Legal Aid, appeared at the time of entering pleas of not guilty is so innocuous that it deserves no further comment.

We have examined the record and do not discern any conflict of interest during the trial. The argument that Halvorsen, who did not testify at the guilt phase, testified at the penalty phase that he shot two of the victims for the reason he was afraid of Willoughby does not rise to the level of conflict of interest. The argument that Willoughby's counsel did not effectively cross-examine Halvorsen or Hutchens for the reason Hutchens' counsel was from the same Legal Aid office is simply not borne out by the record. The trial court did not abuse discretion by denying separate trials and had no reason to inquire into dual representation or potential conflict. Cf. *White v. Commonwealth*, Ky., 671 S.W.2d

241 (1983); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

In any event, Willoughby fails to demonstrate any unfair prejudice from these issues.

Willoughby next argues that pretrial taped and oral confessions made by him were improperly admitted. Willoughby had moved to suppress the statements on the ground that they were involuntary due to his drug and alcohol intoxication.

■ The traditional rule is that a confession otherwise voluntary is not to be excluded by reason of self-induced intoxication unless "the accused was intoxicated to the degree of mania, or of being unable to understand the meaning of his statements." *Britt v. Commonwealth*, Ky., 512 S.W.2d 496, 499 (1974). Having reviewed the briefs and excerpts from the record, we cannot say that Willoughby had reached such a degree of mania as to require the exclusion of his statements. The trial court's ruling that the confession was voluntary cannot be disturbed on appeal unless clearly erroneous. *Sampson v. Commonwealth*, Ky., 609 S.W.2d 355 (1980). The court's ruling is supported by substantial evidence, and its factual findings are conclusive. RCr 9.78.

■ Willoughby next complains that the trial court erred in failing to instruct the jury on all mitigating factors. This argument is without merit. Willoughby first argues that it was error for the court to not instruct on the mitigating circumstance of his lack of a significant history of prior criminal conduct. The court's refusal to give such an instruction is not surprising considering the fact that Willoughby had a criminal repertoire which included convictions of first-degree robbery, first-degree burglary, and theft by unlawful taking. Willoughby claims that the court erred by not *sua sponte* instructing the jury on some twenty-odd factors as mitigating circumstances, such as his not being a mean person, his trouble coping as a young child, and his having been shot in the face accidentally as a young man. The trial court did not preclude the jury from considering

these factors, since the jury was instructed as follows:

In addition to the foregoing (statutory mitigating factors) you may consider any other circumstances which you consider mitigating even though they are not listed above.

The jury was encouraged to consider any evidence it pleased in mitigation, and nothing was precluded from its consideration to that effect. We are of the opinion no error occurred here. See *White v. Commonwealth*, Ky., 671 S.W.2d 241 (1983).

We have reviewed the other assertions of error and are of the opinion none of them merits comment.

■ This gruesome slaughter of human beings is portrayed by the testimony of an eyewitness who stated that Greene's wounds caused her to cry, moan, and convulse until Willoughby ended her suffering with two additional shots, the last to the back of the head.

We have conducted our review of the death sentence in accordance with the provisions of KRS 532.075. We are of the opinion from the record that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor and that the evidence supports the finding of an aggravating circumstance. KRS 532.025(2)(a).

We have considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases and have in this regard considered the crimes committed here and all of the evidence surrounding Halvorsen and Willoughby and their backgrounds.

The data for our use in this regard have been compiled in accordance with KRS 532.075(6)(a), (b), and (c). We have considered all of the cases in which the death penalty was imposed after January 1, 1970, as follows: *Scott v. Commonwealth*, Ky., 495 S.W.2d 800 (1972); *Leigh v. Commonwealth*, Ky., 481 S.W.2d 75 (1972); *Lenston and Scott v. Commonwealth*, Ky., 497 S.W.2d 561 (1973); *Call v. Commonwealth*, Ky., 482 S.W.2d 770 (1972); *Caldwell v. Commonwealth*, Ky., 503 S.W.2d 485 (1972); *Tinsley and Tinsley v. Commonwealth*, Ky., 495 S.W.2d 776 (1973); *Galbreath v. Commonwealth*, Ky., 492 S.W.2d 882 (1973); *Caine and McIntosh v. Commonwealth*, Ky., 491 S.W.2d 824 (1973); *Hudson v. Commonwealth*, Ky., 597 S.W.2d 610 (1980); *Meadows v. Commonwealth*, Ky., 550 S.W.2d 511 (1977); *Self v. Commonwealth*, Ky., 550 S.W.2d 509 (1977); *Boyd v. Commonwealth*, Ky., 550 S.W.2d 507 (1980); *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980); *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519 (1984); *White v. Commonwealth*, Ky., 671 S.W.2d 241 (1984); *Harper v. Commonwealth*, Ky., 694 S.W.2d 665 (1985); *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672 (1985); *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384 (1985); *Bevins v. Commonwealth*, Ky., 712 S.W.2d 932 (1986); *Matthews v. Commonwealth*, Ky., 709 S.W.2d 414 (1986); and *Marlowe v. Commonwealth*, Ky., 709 S.W.2d 424 (1986).

The cases preceding *Gall* have had the death penalty set aside for the reason the statute was invalid under *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In making a comparative study of these cases and the circumstances in this case, we are of the opinion the sentence of death here is not excessive or disproportionate to the penalty imposed in the enumerated cases.

The judgment is affirmed.

STEPHENS, C.J., and GANT, LEIBSON, WHITE and WINTERSHEIMER, JJ., concur.

VANCE, J., dissents and files a separate dissenting opinion.

LEIBSON, Justice, concurring.

I concur with this opinion except for that portion of the opinion stating Supreme Court proportionality review pursuant to KRS 532.075 is limited to prior cases wherein the death penalty was both imposed and affirmed. It is my opinion that the review of "similar" cases, as called for by the statute, requires us to consider all cases where the death penalty was imposed, regardless of whether the sentence was affirmed or reversed on appeal.

VANCE, Justice, dissenting.

In a death penalty case, a juror should not be encouraged to take lightly his responsibility in fixing death as a punishment. Our statute provides that the jury can only recommend the death penalty but that the actual sentencing is the responsibility of the Judge. Jurors should not be led to believe, however, that they should keep the option of the imposition of the death penalty open by recommending it because the Judge can reduce the sentence if he feels it is not warranted.

I believe the Commonwealth's attorney, both in questions on voir dire and in final argument, gave the jurors reason to believe the responsibility would not rest upon them, but upon the trial judge, if appellant were executed.

In the voir dire examination of Francis White, the following question was asked:

Q. Okay. In Kentucky the jury does not set the penalty in a death penalty case. They recommend the penalty to the judge, Okay? I think maybe earlier you—you probably, if you remember, were told in jury orientation that in a criminal case the jury sets the penalty, like on a theft case, and that's true. But in a death penalty case, the jury recommends to the Judge, so in effect if you're the juror in this case you would be recommending a sentence to Judge Angelucci; you understand?

A. Yes, I think.

In the concluding argument, the Commonwealth's attorney stated:

In these instructions it's very clear that your recommendation, your verdict, is a recommendation to Judge Angelucci in this case. You don't set the sentence in this case; you recommend it.

References such as these by the Commonwealth's attorney, it seems to me, are likely to cause a juror to recommend a death penalty, knowing the Judge might later reduce it, even though the same juror would not have imposed the death penalty had the matter been left entirely up to him.