NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 19a0458n.06

Case No. 14-6505

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 29, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MITCHELL WILLOUGHBY, | ) | |
| | ) | |
| *Petitioner-Appellant*, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| RANDY WHITE, Warden, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| *Respondent-Appellee*. | ) | |
| | ) | |

Before: COLE, Chief Circuit Judge; BATCHELDER and GRIFFIN, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. A Kentucky prisoner, sentenced to death, appeals the denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. We AFFIRM.

**I.**

On January 13, 1983, Mitchell Willoughby and Leif Halvorsen went to Joe Norman's house. Willoughby had a contentious relationship with Norman, and both he and Halvorsen went there armed. Both were also intoxicated. Willoughby's girlfriend, Susan Hutchens, went separately to Norman's house, but she was also armed and had purchased ammunition for Willoughby and Halvorsen earlier in the day. When they arrived, Norman was there with his girlfriend, Jaqueline Greene, and her friend, Joey Durrum. Discussion among Willoughby, Halvorsen, and Norman became heated, tempers flared, and Willoughby and Halvorsen started shooting. Norman was killed immediately but, after the initial shooting stopped, Willoughby executed the wounded Greene and Durrum. Willoughby and Halvorsen wrapped the three bodies in sheets, tied rocks to them with rope, and loaded them into a van. That night, they drove the

bodies to a bridge from which they intended to dump them into the river. Only one body, however, landed in the riverbed and, for whatever reason, they left the other two bodies on the bridge.

When the police connected the crimes to Willoughby, he claimed that he shot Norman in self-defense but had no recollection of shooting the others. The police established that all three victims had been shot with both Willoughby's and Halvorsen's guns. The prosecutor charged Willoughby, Halvorsen, and Hutchens, but tried Hutchens separately—she testified against Willoughby and Halvorsen. At trial, Willoughby testified and took responsibility for the shootings; Halvorsen did not testify. The jury convicted both men of all three murders and recommended the death penalty for the executions of Greene and Durrum.

Willoughby appealed[1] and the Kentucky Supreme Court affirmed, rejecting, among other things, Willoughby's two claims of prosecutorial misconduct. The first was that the prosecutor had impermissibly minimized the jurors' responsibility on the death-penalty question by phrasing his voir dire questions and closing argument to suggest that the jurors did not set the death penalty, but merely recommended it to the court, which would then make the actual determination. The other was that the prosecutor had: (1) argued, without evidentiary support, that Willoughby, if left alive, posed a danger to prison guards and inmates, as well as the outside population due to the risk of his escape; (2) likened Willoughby to notorious murderers Gary Gilmore, Charles Manson, and Richard Speck; and (3) vouched for the credibility of prosecution witnesses, investigating police officers, and prosecutor's office staff. The Kentucky Supreme Court rejected these claims, noting that defense counsel had not objected to the statements during trial, that the statements were not as flagrant or improper as Willoughby represented, and that, given the totality of the incriminating evidence, the statements were not prejudicial. *Halvorsen v. Kentucky ("Willoughby I")*, 730 S.W.2d 921, 924-25 (Ky. 1986), *cert. denied*, 484 U.S. 982 (1987).

---

[1] This was a consolidated appeal with the opinion covering the appeals by both Willoughby and Halvorsen.

Willoughby's trial and sentencing were in July and August 1983, and the Kentucky Supreme Court affirmed in December 1986. After that, Willoughby filed several post-conviction motions in state court, only one of which is pertinent here. In that motion, filed in November 2004, Willoughby claimed juror misconduct at his 1983 trial because a juror, Reverend Walter Garlington, had brought his Bible (which he brought with him everywhere) into the jury room, where he read passages from it and led the jurors in daily prayer during deliberations. The Kentucky trial court found this motion untimely—because Willoughby filed it over 20 years after the court had permitted interviews with willing jurors—and dismissed it.[2] The Kentucky Supreme Court held "that the trial court did not abuse its discretion in finding that both Halvorsen's and Willoughby's CR 60.02 motions were not filed within a reasonable time." *Willoughby v. Kentucky ("Willoughby II")*, Nos. 2006-sc-000071, 2007 WL 2404461, at *1 (Ky. Aug. 23, 2007).

In May 2008, Willoughby filed a § 2254 petition, raising several claims, though only three survive to this appeal: (1) juror misconduct for use of the Bible; (2) prosecutorial misconduct for saying the jury's sentencing verdict was just a recommendation; and (3) prosecutorial misconduct for exaggerating Willoughby's danger, likening him to notorious murderers, and vouching for the credibility of prosecution witnesses and staff. The district court denied all of Willoughby's claims. *Willoughby v. Simpson ("Willoughby III")*, No. 5:08-cv-179, 2014 WL 4269115 (E.D. Ky. Aug. 29, 2014).

Willoughby sought and obtained a certificate of appealability for these three issues. *Id*. at *66.

---

[2] The Kentucky Supreme Court also pointed out: "Juror Garlington's strong religious views surfaced during the trial, as is plainly evident from the astonishing fact that the trial court allowed Garlington to lead the courtroom in prayer at the conclusion of the case. So through due diligence and proper questioning, Halvorsen and Willoughby could have learned of any alleged jury misconduct [of this nature] approximately twenty years before they filed their CR 60.02 motion." *Willoughby v. Kentucky*, Nos. 2006-sc-000071, 2007 WL 2404461, at *2 (Ky. Aug. 23, 2007).

**II.**

In an appeal from a district court's finding of a petitioner's procedural default, we review the district court's legal conclusions de novo and its findings of fact for clear error. *Scott v. Houk*, 760 F.3d 497, 503 (6th Cir. 2014).

Willoughby claimed juror misconduct because juror Walter Garlington, who apparently brought his Bible with him everywhere, brought his Bible into the jury room, where he read passages from it and led the jurors in daily prayer during deliberations. The Kentucky trial court dismissed this motion as untimely and the district court denied the claim as procedurally defaulted. Willoughby concedes the default but argues cause and prejudice to overcome it.

"Procedural default" means "a federal court is generally barred from considering an issue of federal law arising from the judgment of a state court if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision." *Stone v. Moore*, 644 F.3d 342, 345 (6th Cir. 2011). To overcome it, a petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[] or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"[T]he existence of cause for [overcoming] a procedural default must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner can make this showing if "the factual or legal basis for a claim was not reasonably available to counsel" or if "some interference by officials made compliance impracticable." *Id.* (citations and quotation marks omitted). Willoughby argued that he was prevented from developing this claim because all but two of the jurors refused to be interviewed after the trial, and those who were interviewed did not alert his investigator to Garlington's Bible

and religiosity. But the Kentucky Supreme Court found that Willoughby had reason to suspect Garlington's religiosity and had the opportunity to investigate. Specifically, Garlington's actions and statements in open court, evident in the state trial-court record, showed that he was openly and actively religious, which put Willoughby on notice then—as much or more so than now—that this was an issue worth investigating with the jurors who did agree to being interviewed. Willoughby concedes that his investigator did not question those jurors about any religious overtures, arguments, or activities that might have affected deliberations. It is not at all certain that Garlington's expression of his religious views represented juror misconduct, but even if we assume that it did, the Kentucky Supreme Court was not unreasonable in its finding that Willoughby had the opportunity to discover Garlington's views and develop this claim a long time ago but failed to do so.

Willoughby argues that he is not responsible for this failure to investigate or discover Garlington's Bible and religiosity during the juror interviews in 1985 and 1988 because the jurors were not forthcoming about that topic at that time. Therefore, he contends, he is entitled to an evidentiary hearing in the federal district court so that he can, presumably, establish cause and prejudice for his failure to raise this claim earlier. Willoughby does not specify the evidence he intends to produce or hopes to uncover at such a hearing (a shortcoming the district court pointed out in its opinion), but he asserts that questions "about the manner in which the Bible and its teachings were used [during deliberations] accentuates the need for an evidentiary hearing at which these issues can be more fully explored." *See* Willoughby's Apt. Reply Br. at 3. Because the only people capable of answering those questions, or fully exploring these issues, are the jurors who were there, this panel is left to surmise that Willoughby wants to compel those jurors to testify about the effect of Garlington's Bible and religiosity on their deliberations.

That is, Willoughby wants a federal court to compel former jurors to testify under oath while his counsel questions them about their deliberations 36 years ago. But such testimony is not admissible in either federal or Kentucky state court. *See* Fed. R. Evid. 606(b)(1) ("During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."); *United States v. Ewing*, 749 F. App'x 317, 326 (6th Cir. 2018) (explaining that the Supreme Court's treatment of Federal Rule of Evidence 606 "seeks to assure that the private deliberations of jurors do not become the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference" (quotation marks omitted)); Ky. R. Crim. P. 10.04 ("A juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot."); *Bowling v. Kentucky*, 168 S.W.3d 2, 7 (Ky. 2004) ("It has long been the rule that jurors may give evidence to prove that the jury was not guilty of misconduct but may not impeach the verdict by stating that they acted wrongfully or irregularly."); *Cape Pub., Inc. v. Braden*, 39 S.W.3d 823, 826 (Ky. 2001) ("Even after completing their service, jurors are entitled to privacy and to protection against harassment.").

We find no basis on which to order a hearing or to grant habeas relief on this claim.

## III.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides the standard for Willoughby's other two claims. Under AEDPA, the federal habeas court may overturn a state court conviction if the last reasoned opinion in a state court to adjudicate the challenged issue on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

To prevail under the "contrary to" clause, a petitioner must show that the state court "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or that it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite" to that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). To prevail under the "unreasonable application" clause, a petitioner must show that "the state court identifie[d] the correct governing legal principle from th[e] Court's decisions but unreasonably applie[d] that principle to the facts of the [petitioner's] case." *Id*. at 413. For purposes of AEDPA, "clearly established federal law" refers only "to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quotation marks omitted).

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotation marks omitted). It is not enough that "the federal habeas court might conclude in its independent judgment that the state court applied clearly established federal law erroneously or incorrectly." *Gagne v. Booker*, 680 F.3d 493, 513 (6th Cir. 2012) (en banc) (quotation and editorial marks omitted). The relevant state-court decision must have applied clearly established federal law in an objectively unreasonable manner, *Renico*, 559 U.S. at 773, such that its decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

### A.

Willoughby claims the prosecutor impermissibly minimized the jurors' responsibility on the death-penalty question by phrasing his voir dire questions and closing argument to suggest that the jurors did not select the death sentence, but merely recommended it to the court, which would then make the actual determination. The Kentucky Supreme Court found that defense counsel had

7

not objected to these statements during trial, that the phrasing was not as improper as Willoughby represented, and that it had not misled the jurors as to their responsibility. *Willoughby I*, 730 S.W.2d at 923-25 (explaining that "no objections were made to any of the questions on voir dire for the very good reason [that] there was nothing to object to," and the court's "reading of the closing argument convince[d] [it] that the responsibility of the jurors in recommending the death penalty was not diminished"). As a "determination of the facts," we cannot conclude that this considered determination by the Kentucky Supreme Court, based on its review of the record, was necessarily "unreasonable." *See* 28 U.S.C. § 2254(d)(2).

As an "application of [the] law," under § 2254(d)(1), the undisputed rule, relevant here, is that "it is constitutionally impermissible to rest a death sentence on a determination made by a [juror] who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985). "To establish a *Caldwell* violation, a [petitioner] necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989). Conversely, "if the challenged [statements] accurately described the role of the jury under state law, there is no basis for a *Caldwell* claim." *Id.* The exact text of the Kentucky statute says: "the jury shall . . . *recommend* a sentence for the defendant [and,] [u]pon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law." K.R.S. § 532.025(1)(b) (emphasis added) (as enacted in 1976 and still effective).

In September 1988, the Kentucky Supreme Court judicially clarified, meaning that it corrected, this rule for purposes of future *Caldwell* analyses by holding that in capital cases in which trial commences after September 8, 1988, "the effective date of the finality of this opinion," the word "recommend" may not be used with reference to a jury's sentencing responsibilities in voir dire, instructions, or closing argument. *Tamme v. Kentucky*, 759 S.W.2d 51, 53 (Ky. 1988).

The court explained that, in *Sanborn*, decided June 9, 1988, it had noted that use of the word "recommend" was not "per se reversible error," but in *Grooms*, also decided June 9, 1988, it had held that the instructions on the penalty phase should require the jury to *fix* the punishment. *Id*. The facts of *Tamme* compelled the court to "take the next step." *Id.* (quotation marks and citations omitted). Therefore, prior to September 1988, the Kentucky Supreme Court's (evolving) position on K.R.S. § 532.025(1)(b) with respect to *Caldwell* was that the trial court's instructions must ensure that the jury would decide the death sentence, with the effect that the "use of the word 'recommend' [wa]s not per se reversible error." *Tamme*, 759 S.W.2d at 53.

We must, therefore, put the present case in a temporal context. Willoughby's three-week trial was from July 5 to July 26, 1983, and his sentencing was in late August 1983. The Supreme Court issued *Caldwell* two years later, on June 11, 1985, and subsequently held that it was a new rule of constitutional law that is not retroactive on habeas. *Sawyer v. Smith*, 497 U.S. 227 (1990). But *Caldwell* would, and did, apply in Willoughby's direct appeal, decided December 18, 1986, and the Kentucky Supreme Court cited it as controlling law on this issue. At that time, however, still two years prior to *Tamme*, the Kentucky Supreme Court was still holding that the mere use of the word "recommend," "which is in the statute and necessarily the instructions, . . . does not, in any fashion, diminish or lessen the responsibility of the jury in imposing the death penalty," *Willoughby I*, 730 S.W.2d at 925. And, again, it was not until two years later, in September 1988, that the Kentucky Supreme Court, after some prior tentative steps, fully changed course, via *Tamme*, and prohibited the use of the word "recommend" in Kentucky capital cases. Given this state of the law, we cannot conclude that *Caldwell*, in its present formulation, was so clearly established in December 1986 that the Kentucky Supreme Court's careful application of it—in assessing the prosecutor's conduct three years earlier—was necessarily unreasonable.

In its application of *Caldwell*, the Kentucky Supreme Court considered the prosecutor's use of the word "recommend" at trial and sentencing and determined that, as used in context, the prosecutor did not use it to suggest to the jurors a "diminished responsibility." Rather, the prosecutor consistently and repeatedly emphasized to the jurors their "responsibility . . . in imposing the death penalty." *Willoughby I*, 730 S.W.2d at 925. Neither the Kentucky Supreme Court's factual determination nor its application of *Caldwell* was necessarily unreasonable.

We find no grounds to grant habeas relief on this issue.

**B.**

Willoughby claims the prosecutor (1) argued, without evidentiary support, that Willoughby, if left alive, posed a danger to prison guards and inmates as well as the outside population due to the risk of his escape; (2) impermissibly likened Willoughby to notorious murderers Gary Gilmore, Charles Manson, and Richard Speck; and (3) improperly vouched for the credibility of prosecution witnesses, investigating police, and prosecutor's office staff. The Kentucky Supreme Court found that defense counsel had not objected to the statements during trial, that they were not as flagrant or improper as Willoughby represented, and that they were not prejudicial given the totality of the incriminating evidence against Willoughby. *Willoughby I*, 730 S.W.2d at 925 (stating that "on the whole, the [prosecutor's closing] argument was [a] fair comment on the evidence" and likely did not affect the verdict, "[c]onsidering the overwhelming nature of the evidence against Halvorsen and Willoughby, including their own admissions").

For prosecutorial misconduct claims, the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). This court uses a two-step test, asking whether the comments were improper and, if so, were they flagrant, based on whether they were misleading to the jury or prejudicial to the petitioner, isolated

10

or extensive, deliberate or accidental, or overwhelmed by the evidence against the defendant. *Moore v. Mitchell*, 708 F.3d 760, 799 (6th Cir. 2013).

Read in context, the prosecutor's statements, allegedly about Willoughby, were generic reasons for imposing the death penalty rather than life imprisonment, based on a hypothetical inmate, "Frank," and the threat that Frank would pose to others, and his incentive to escape, while serving a life sentence. But the prosecutor did not say that Willoughby would personally pose a threat to inmates or prison personnel, that Willoughby would escape from prison, or that Willoughby could not be rehabilitated. Similarly, the prosecutor did not actually liken Willoughby to Gilmore, Manson, or Speck. Rather, in discussing the deterrent effect of a death sentence over life imprisonment, the prosecutor said that Gilmore (having been executed) was unequivocally deterred and of no future danger to anyone whereas Manson and Speck (imprisoned for life) were not.

The prosecutor's comments about witnesses, police, and prosecutorial staff urged the jurors to draw an inference from the evidence presented. They were not unsubstantiated personal opinions. A prosecutor may not vouch "by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's] office [] behind that witness," *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999), but a prosecutor may ask the jury to draw reasonable inferences of credibility from the evidence presented, *United States v. Parker*, 49 F. App'x 558, 563 (6th Cir. 2002). That is all that happened in this case, in which the prosecutor backed up any comments by asking the jurors to recall the testimony that supported the corresponding assertion.

Read in context, none of the prosecutor's comments were clearly improper and none of this commentary could be called flagrant. But we do not review this claim de novo; we review it with proper deference. Even if we were to disagree with the Kentucky Supreme Court's assessment of this commentary, we would set that disagreement aside and consider whether that assessment, even

if mistaken, was reasonably mistaken. Willoughby has not shown that the Kentucky Supreme Court was unreasonable in finding the comments were neither improper, nor flagrant, nor necessarily prejudicial when considered alongside the overwhelming evidence of his guilt.

We find no grounds to grant habeas relief on this issue.

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

COLE, Chief Judge, concurring in part and dissenting in part. I agree with the majority that we should affirm the denial of habeas relief as to Willoughby's first and third claims, though I would reach that result differently, as explained below. I would, however, conclude that the prosecutor unconstitutionally minimized the importance of the jury's role in recommending the death sentence, and thus I dissent as to Willoughby's second claim of relief.

As to Willoughby's first claim regarding his knowledge of Garlington's deeply-held religious beliefs, the majority's position would require defendants to assume that a juror who is known to be religious would disregard the court's instructions and attempt to exert improper influence over other jurors, rather than base the verdict on the evidence alone. Such an assumption—that jurors' religious beliefs will improperly affect their decisions—runs contrary to Supreme Court precedent, which acknowledges that even a juror with strong religious beliefs may "nonetheless subordinate his personal views to what he perceive[s] to be his duty to abide by his oath as a juror and to obey the law of the State." *Witherspoon v. Illinois*, 391 U.S. 510, 514 n.7 (1968). A juror's religion cannot alone constitute notice that the juror will use extraneous materials in reaching a verdict, let alone that he or she would attempt to induce other jurors to do the same.

Here, Garlington's responses during voir dire gave Willoughby no reason to believe that Garlington would be guided by anything other than the facts and the law presented to him; repeatedly, Garlington provided answers that assuaged any concerns that his religious beliefs would impact his role as a juror. Twenty years later, Garlington made statements that—for the first time—indicated that his religious beliefs may have led him to improperly influence the verdict. Garlington admitted that he read passages from the Bible to the other jurors every day of the trial and deliberations, including a passage that states: "The face of the Lord is against them that do evil, to cut off the remembrance of them from the earth," and "Evil shall slay the wicked; and those who hate the righteous will be condemned." (Pleadings, Vol. 1 of 1, p. 32, ¶ 5; Appellant

13

Br. 22 (quoting Psalm 34:8, 15–16, 21–22, The Holy Bible, King James Version).) When this information came to light, and another juror recalled that Garlington was "pro death" and had conducted prayers with the jury (Pleadings, Vol. 1 of 1, p. 32, ¶ 8), Willoughby filed a post-judgment motion regarding the claim now before this court, requesting an evidentiary hearing to show cause and prejudice to excuse his procedural default. The district court denied Willoughby's request for an evidentiary hearing.

The majority contends there is no basis for an evidentiary hearing because juror testimony about the import of Garlington's actions would be inadmissible, citing federal and Kentucky law that generally prohibits juror testimony about deliberations. (Maj. Op. 5–6.) But Willoughby alleges that reading pro-death passages from the Bible during deliberations amounted to an *external* prejudicial influence on jurors, and both federal and Kentucky law provide exceptions for juror testimony about extraneous prejudicial information. The text of the federal rule expressly states that a "juror may testify about whether . . . extraneous prejudicial information was improperly brought to the jury's attention[.]" Fed. R. Evid. 606(a)(2)(A). And Kentucky courts have held that, when a criminal defendant alleges that "extraneous information by way of an overt act"—such as jurors' use of a dictionary, *Commonwealth v. Wood*, 230 S.W.3d 331, 334 (Ky. Ct. App. 2007)—"was, allegedly, improperly interjected into the jury deliberation process[,]" such an "allegation falls within the constitutional exceptions to RCr 10.04 that, upon a proper presentation to the court, would justify further inquiry in the form of an evidentiary hearing." *Commonwealth v. Abnee*, 375 S.W.3d 49, 55 (Ky. Ct. App. 2012).

Thus, I part ways with the majority in two critical respects on Willoughby's first claim: I believe that the district court erred in finding that Garlington's expression of his religious belief placed Willoughby on notice that he used the Bible as an extrinsic source in the jury room during

deliberations, and that the district court *could have* ordered the jurors to testify about any prejudicial impact this external source had on their deliberations.

But the decision to grant an evidentiary hearing is ultimately left to the district court's discretion, and "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007). Below, Willoughby argued that an evidentiary hearing was required for the purpose of recalling two jurors he had already interviewed, neither of whom provided any information in the first interview to suggest Garlington's readings had influenced their verdict. I would conclude that the district court did not abuse its discretion in concluding that Willoughby's request to recall two jurors he had already questioned would not enable him to establish cause and prejudice. *Willoughby III*, 2014 WL 4269115, at *17 (E.D. Ky. Aug. 29, 2014). Consequently, I concur with the majority as to Willoughby's first claim.

As to Willoughby's second claim, the Supreme Court held in *Caldwell v. Mississippi* that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. 320, 328–29 (1987). The policy reasons behind this holding are oft-cited and beyond debate, but they bear repeating. "In the capital sentencing context there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court." *Id.* at 330. Indeed, "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Id.* at 333. "[O]ne can easily imagine that in a case in which the jury is divided on the proper sentence,

the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in." *Id.* Furthermore, *Caldwell* emphasized that it is "plausible to believe that many jurors will be tempted to view these respected legal authorities as having more of a 'right' to make such an important decision than has the jury." *Id.*

As the majority acknowledges, although *Caldwell* was decided after Willoughby's trial, "*Caldwell* would, and did apply in Willoughby's direct appeal, decided December 18, 1986[.]" (Maj. Op. 9.) Where the majority is mistaken, however, is in its misreading of Kentucky state law. Rather than acknowledge Kentucky law in its entirety, the majority relies wholly on the fact that *Tamme v. Kentucky*, 759 S.W.2d 51 (Ky. 1988)—a case that explicitly held that prosecutors could not use the word "recommend" with reference to a jury's sentencing responsibilities—had not yet been decided. The majority thus posits that at the time of Willoughby's direct appeal, "still two years prior to *Tamme*, the Kentucky Supreme Court was still holding that the *mere* use of the word 'recommend,' 'which is in the statute and necessarily the instructions, . . . does not in, any fashion, diminish or lessen the responsibility of the jury in imposing the death penalty[.]'" (Maj. Op. 9 (emphasis added) (citing *Willoughby I*, 730 S.W.2d 921, 925 (Ky. 1986)).) The majority's position contains two critical flaws: first, the majority's characterization of the caselaw is left wanting; and second, the prosecutor did not "merely" use the word recommend in this case.

A quick review of both Kentucky law and Supreme Court precedent is instructive. In the years prior to *Tamme*, the Kentucky Supreme Court recognized that prosecutors' use of the word "recommend" in certain situations improperly diminished jurors' responsibility in capital cases. *Id.* ("Despite this Court's efforts to map out the territory of permissible use of the word 'recommend,' prosecutors continue to nudge at the boundary of abuse.") In 1984, two years prior to Willoughby's direct appeal, the Kentucky Supreme Court held in *Ice v. Commonwealth* that

16

"emphasis on the jury's sentence as only a recommendation is improper." 667 S.W.2d 671, 676 (Ky. 1984).

The next year, in 1985, the Supreme Court decided *Caldwell*, and shortly thereafter the Kentucky Supreme Court held in *Ward v. Commonwealth* that the government had "committed a grievous error by repeatedly minimizing the responsibility of the jury in assessing the death penalty." 695 S.W.2d 404, 407 (Ky. 1985). The Kentucky Supreme Court continued:

> We are totally aware that the statute relating to capital offenses—KRS 532.025(1)(b)—provides that the jury shall "*recommend* a sentence for the defendant." However, the death penalty cannot be assessed by any judge unless recommended by the jury, so the responsibility of the jury in such cases remains undiminished.
> …
>
> It is the responsibility of each juror to decide whether the defendant will be executed, and they shall not be informed, either directly or by implication, that this responsibility can be passed along to someone else. The mere fact that the statute provides for jury recommendation cannot be utilized as a license to induce the jury to disregard its responsibility

*Id.* at 407–08 (emphasis in original).

The Kentucky Supreme Court also decided *Kordenbrock v. Commonwealth* that same year. There, the court found that although "[t]he word 'recommend' was used, [it was] not to such an extent as to denigrate the responsibility of the jury in imposing a death penalty." 700 S.W.2d 384, 389 (Ky. 1985). And finally, the Supreme Court decided *Darden v. Wainwright* several months before the Kentucky Supreme Court heard Willoughby's direct appeal, reiterating that *Caldwell* applies to comments "that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." 477 U.S. 168, 183 n.15 (1986).

It is against that background that we consider Willoughby's case. Here, there is no doubt that the prosecutor repeatedly and unequivocally attempted to minimize the jurors' role. During voir dire, prosecutors emphasized to eight of the twelve jurors that a jury's role in a death penalty

case was to recommend the imposition of the death sentence to the judge. For some jurors, the prosecutor clearly insinuated that the final responsibility of the sentence would *not* rest with the jury. (*See* TT Vo. 4, p. 586–87 (Q: "Do you understand that in a sentencing—in the sentencing format of this—of this case if you're selected as a juror, that you would recommend a sentence to the judge and *not set the sentence*?") (emphasis added); TT Vo. 7, p. 917 (Q: "…The jury, after hearing testimony and evidence, if they find the defendants guilty, when they set a penalty, they *simply recommend that penalty to the judge…*") (emphasis added).) And it is clear from the trial transcript that based on the prosecutor's statements, the jurors did in fact feel a diminished sense of responsibility:

> Q: …Could you distinguish between the two [defendants] and reach different levels of verdict of guilty? You'll have the option, I believe, of finding the defendants guilty of any one of a series of degrees of offenses? Could you find them guilty of different levels of -- of an offense?
>
> A: Like I said, it's according on [sic] what they had done and the show the proof of it. [sic] Then I could probably rule on it that way.
>
> Q: You could distinguish between the two?
>
> A: Yes.
>
> Q: Could you fix different sentences for them?
>
> A: Well I could probably fix different sentences, *but I didn't think it would be left up to me* to----
>
> Q: You could recommend it?
>
> A: Yeah, *I could recommend it, say it like that*, you know.

(TT Vol. 5, p. 724–25 (emphasis added).)

The prosecutor's attempt to minimize the jury's role continued into his closing arguments at sentencing, where he described the jury's verdict as a "recommendation" on *twenty* occasions. (*See, e.g.*, TT. Vol. 5, p. 2561 ("I anticipate that . . . in the final arguments[] the defense attorneys will attempt to make you feel like you are murderers if you return a recommendation of death … Is Judge Angelucci a murderer should he decide to follow your recommendation that the death penalty is the proper penalty in this case?").)

The record thus makes it clear that the prosecutor's aim was to minimize the jury's role in sentencing repeatedly, not to "merely" read the word "recommend" as it is articulated in the Kentucky statute. Yet the Kentucky Supreme Court held, with no analysis, that "[n]o such minimizing of the jury's sense of responsibility occurred in this case in the voir dire or the closing argument." *Willoughby I*, 730 S.W.2d at 924. The majority attempts to defend this holding, stating that "we cannot conclude that *Caldwell*, in its present formulation, was so clearly established in December 1986 that the Kentucky Supreme Court's careful application of it . . . was necessarily unreasonable." (Maj. Op. 9.) But nothing about the Kentucky Supreme Court's application was careful, let alone reasonable. While use of the word "recommend" was not per se reversible error at the time, the state of the law in Kentucky in 1986 was still clear: use of the word "recommend" in describing the jury's role was permissible, as the Kentucky statute specified, as long as there was *no attempt* by prosecutors to *minimize* jurors' role in a way that led them to feel that they had a reduced role in the sentencing process. Failing to recognize that in this case, the Kentucky Supreme Court unreasonably applied clearly established law. And the majority incorrectly endorsed this approach.

At base, the prosecutor's statements in this case are exactly what *Caldwell* aimed to protect against—a jury that did not feel the full weight of their "truly awesome responsibility" in recommending a death sentence. 472 U.S. at 341. The Kentucky Supreme Court's one-sentence finding was an unreasonable application of *Caldwell*. Accordingly, I depart from the majority on this issue and would reverse and remand to the district court.

Finally, I turn to Willoughby's claim of prosecutorial misconduct during sentencing. To show prosecutorial misconduct, Willoughby must demonstrate two things: (1) initially, he must show that the prosecution's conduct was improper; and then, if he meets that hurdle, (2) that the conduct was so flagrant as to warrant reversal. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

19

The majority makes serious errors in addressing both of these elements, making some additional analysis necessary.

In addressing whether the prosecutor's statements were improper, the Kentucky Supreme Court concluded that although "[b]rief portions of the [prosecutor's] argument were irrelevant, [] on the whole, the argument was fair comment on the evidence." *Willoughby I*, 730 S.W.2d at 925. Likewise, the majority finds, without citation, that "[r]ead in context, none of the prosecutor's comments were clearly improper[.]" (Maj. Op. 11.) But in *Darden*, the Supreme Court condemned the prosecutor's closing arguments as "undoubtedly" improper, which included comments that "implied [] the death penalty would be the only guarantee against a future similar act." 477 U.S. at 180. Here, as was the case in *Darden*, the prosecutor argued that a death sentence was the only way to keep the public and inmate population safe, alluded to Willoughby's potential escape, and questioned whether the jurors "want[ed] to establish a standard in [Lexington] that you can murder three people in cold blood and have no legitimate fear of the death penalty?" (TT Vol. 18, p. 2560.) Furthermore, the prosecutor likened Willoughby to notorious killers, including Gary Gilmore, Charles Manson, Richard Speck, and Martin Luther King, Jr.'s assassin. Under our precedent, these comments were clearly improper. *See Darden*, 477 U.S. at 180 (prosecutor's comments that sentencing defendant to death was the only way to ensure he would not escape from prison or harm others was improper); *Goff v. Bagley*, 601 F.3d 445, 480 (6th Cir. 2010) (finding prosecutor's comments about the jury setting society's standards of behavior improper); *Beuke v. Houk*, 537 F.3d 618, 649 (6th Cir. 2008) (holding that the prosecutor made improper statements "calculated to incite the passions and prejudices of the jurors," when he appealed to the juror's fears that the defendant would commit additional crimes if he was eventually released from prison).

This, however, does not end the inquiry. We must also look to see if the challenged conduct can be considered flagrant. *Millender v. Adams*, 376 F.3d 520, 526 (6th Cir. 2004). In so doing, we consider four factors: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *Bates*, 402 F.3d at 641.

In describing the fourth factor, the majority looks to whether the improper statements were "overwhelmed by the evidence against the defendant." (Maj. Op. 11.) Similarly, the Kentucky Supreme Court found that, in light of "the overwhelming nature of the evidence" against Willoughby, including his own admissions, "we do not think that the prosecutor's argument exceeded the bounds of propriety, nor do we think that it could have added much fuel to the fire anyway." *Willoughby I*, 730 S.W.2d at 925 (internal citations omitted).

In both instances, reliance on the "overwhelming nature of the evidence" was improper. "In the context of a death penalty sentencing hearing," as opposed to a traditional trial, "[r]ather than determining whether a constitutional error would have pushed a jury from a 'not guilty' verdict to a 'guilty' verdict, we must ascertain whether the constitutional error influenced the jury's decision between life and death." *Bates*, 402 F.3d at 641. Thus, the Kentucky Supreme Court's and the majority's reliance on the overwhelming evidence of Willoughby's guilt is irrelevant to the key question—whether the prosecutor's comments influenced the jury's decision between sentencing Willoughby to life imprisonment versus death. *See id.* at 648–49.

Properly understood, the fourth factor asks whether the improper comments "were so egregious as to 'preclude the jury's proper consideration of mitigation.'" *Broom v. Mitchell*, 441 F.3d 392, 414 (6th Cir. 2006) (quoting *Bates*, 402 F.3d at 649). If the court were hearing this case on direct appeal, I believe the evidence in this case could lead us to conclude that the prosecutor's

statements were sufficiently egregious. But this case is before us on a petition for a writ of habeas corpus, "[s]o the relevant question is not whether the [Kentucky Supreme Court's] decision was wrong, but whether it was an unreasonable application of clearly established federal law." *Macias v. Makowski*, 291 F.3d 447, 454 (6th Cir. 2002). Bound by that deferential standard, I thus concur with the majority's ultimate conclusion that the Kentucky Supreme Court was not objectively unreasonable in determining that no "grave doubt as to the harmlessness of the error" existed in this case, given the prosecutor's reference to other proper aggravating factors at sentencing and the comparatively minimal mitigating factors presented to the jury. *Bates*, 402 F.3d at 649 (internal quotation marks and citation omitted); *see also Beuke*, 537 F.3d at 650. .

As explained above, I concur in the denial of habeas relief as to Willoughby's first and third claims. But as to the second claim, "[t]his Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.'" *Caldwell*, 472 U.S. at 341. Here, the prosecutor repeatedly "sought to minimize the jury's sense of responsibility for determining the appropriateness of death," such that it affected the fundamental fairness of Willoughby's sentence proceeding. *Id.* The correct course is thus to reverse and remand to the district court on this issue, with instructions to grant Willoughby's petition for habeas corpus. Accordingly, I respectfully dissent as to Willoughby's second claim for relief.